Edward L. **JOHNSON**, on behalf of himself and all other employees similarly situated, Plaintiffs,

v.

**PIKE CORPORATION OF AMERICA,** Defendant.

Civ. No. 68–1688–F.

United States District Court, C. D. California.

Sept. 29, 1971.

Jack M. Newman, Los Angeles, Cal., for plaintiff.

Richard F. Oetting, of Voegelin & Barton, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

The question presented is whether Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) prohibits an employer covered by the Act from discharging a black person solely because his wages have been garnisheed to satisfy judgments.

Plaintiff, Edward L. Johnson, a black person, was employed by defendant, an employer within the meaning of 42 U.S.C. § 2000e(b), on May 7, 1965, as a warehouseman. During the period of his employment with defendant, plaintiff's wages were garnisheed several times in satisfaction of judgments against him. On February 15, 1968, after issuing several warnings to plaintiff, defendant discharged plaintiff on the ground that he was in violation of defendant's Company Rule 6, which reads: "Conduct your personal finances in such a way that garnishments will not be made on your wages." It was a company policy to issue a warning after the first garnishment and to terminate after several garnishments.

After filing charges with the Equal Employment Opportunity Commission, and further complying with the requirements of Section 706 of Title VII (42 U.S.C. § 2000e–5), plaintiff filed the present action alleging his discharge was the result of discrimination against him because of his race. The prayer was for money damages and an order enjoining defendant from any further application of Rule 6. The defendant answered the complaint, denying any and all liability to plaintiff and denying that plaintiff was discharged from his employment or in any respect discriminated against by defendant on account of his race.

The plaintiff does not contend, except for the effect of Rule 6, that the defendant has ever engaged in any racial discrimination in its employment practices. Furthermore, plaintiff concedes that Rule 6 was never intended by the defendant to be racially discriminatory.

After extensive discovery and pre-trial conferences, the parties submitted to the court for its approval a stipulation for judgment against the defendant. The stipulation provides for the following:

(1) Plaintiff is to have judgment and money damages for the difference between what he has earned since defendant terminated his employment and what he would have earned had he been continuously employed by defendant from the date of his termination through December 31, 1970. The parties have stipulated this sum to be $3,173.32. Plaintiff shall also recover reasonable attorney's fees and costs.

(2) Defendant is restrained and enjoined from discharging any employee by reason of the fact that said employee's wages are attached and garnisheed pursuant to said Rule 6.

■ The court approves the stipulation and orders that judgment be entered for the reasons set forth herein. The issue presented has not been rendered moot by Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), which invalidates summary attachments of wages prior to judgment. In this case the plaintiff's wages were garnisheed after judgments were obtained against him.

Plaintiff bases his claim on several statutory provisions, namely, 42 U.S.C. § 2000e, et seq. (Title VII of the Civil Rights Act of 1964), and 42 U.S.C. §§ 1981, 1983 and 1985 (the Civil Rights Acts of 1870 and 1871). Although the court is of the opinion that the complaint raises substantial questions under §§ 1981, 1983 and 1985, it is not necessary to reach those issues, and accordingly no opinion is expressed on them. It is clear that Title VII of the Civil Rights Act of 1964 is sufficient to support plaintiff's claim.

Section 703(a) (1) of that Act (42 U.S.C. § 2000e-2) makes it an unlawful employment practice for an employer:

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

The Supreme Court was recently called upon to interpret Section 703(a). In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), although the Court cited only Section 703 (a) (2), it is clear from the decisions of the lower courts in that case that both subsections of Section 703(a) were involved in the action. Since these two subsections share the identical purpose and format and overlap considerably in coverage, this court can see no reason to approach the issues covered by subsection 1 any differently than the Supreme Court approached the issues under subsection 2. There, black employees brought suit challenging the requirement by their employer of obtaining a high school diploma or passing specified intelligence tests as a condition of employment in or transfer between certain jobs. The court of appeals adopted the position that an employer's subjective intent should govern the legality of his acts under § 703(a). Since there was no showing that the respondent's high school diploma or intelligence tests requirements had been adopted with any intent or purpose to discriminate, that court found no violation of Title VII. Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970).

■ The Supreme Court reversed, stressing that "[w]hat is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification". 401 U.S. at 431, 91 S.Ct. at 853. The Court adopted a two-step approach to determine whether an employment practice is prohibited by Title VII.

■ The first inquiry is whether the practice discriminates against any person or group on the basis of race (or other impermissible criterion). In this regard, the Court emphasized that "[t]he Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation". 401 U.S. at 431, 91 S.Ct. at 853. The Court found that the requirements of a diploma and intelligence testing, although racially neutral on their face and even though adopted in good faith with no intent to discriminate, did in fact discriminate against blacks in that the requirements rendered ineligible for employment or transfer a markedly disproportionate number of blacks.

The second inquiry is whether the practice bears a "demonstrable relationship" to successful performance of the job. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853. Finding that neither the high school diploma nor the general intelligence test requirements bore the required "demonstrable relationship", the Court held that they violated Title VII.

■ The holding of the Supreme Court was presaged by several lower courts. In Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), the court found that a company's seniority system, although racially neutral on its face and applied in a non-discriminatory manner, violated § 703 because the system was based upon and therefore reflected the discriminatory effects of the previously discriminatory hiring and placement system and there was no "overriding legitimate, non-racial business purpose". 416 F.2d at 989. *See also* Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); United States v. Sheet Metal Workers

International Association, Local Union No. 36, 416 F.2d 123 (8th Cir. 1969). These cases demonstrate that an employment practice violates Title VII whenever it has the foreseeable effect of denying blacks an equal opportunity for employment. The policy or practice may be adopted in good faith with no intent to discriminate, may be racially neutral on its face and may be objectively and fairly applied; it is nonetheless interdicted by Title VII if the consequence of the policy or practice is to discriminate and there is no overriding business purpose.

It might be argued that the *Griggs* decision, as well as the court of appeals' decisions cited, *supra,* are distinguishable from the present action, in that they deal with situations in which the effects of racial discrimination practiced before the effective date of the 1964 Act are carried forward and retained by the facially neutral practice in question. The *Griggs* decision, however, renders this distinction immaterial. The discrimination in *Griggs*—the inferior education received by blacks—is attributable to present as well as past discrimination in educational facilities. The decision cannot be narrowly construed to rest only upon *past* educational differences. Indeed, the entire thrust of the opinion is toward a liberal construction of Title VII so as to fully effectuate the congressional mandate to insure members of minority groups equal employment opportunities and eliminate employment practices which act as "built-in headwinds" for minority groups. The fact that many of the early cases interpreting Title VII were concerned with whether Congress intended the Act to invalidate present and continuing consequences of past discrimination cannot blind us to the fact that the Act also proscribes the present effects of present discrimination.

 Applying these principles to the present case, the court is compelled to find that plaintiff's claims are fully supported by Title VII. The first inquiry is whether defendant's Rule 6 discriminates against black employees in an impermissible manner. It should be emphasized that plaintiff does not contend that defendant adopted the rule for the purpose of discriminating against employees on the basis of race, or that the rule was applied in a racially discriminatory manner. Plaintiff concedes that defendant applied Rule 6 evenhandedly to all employees without regard to race or color. *Griggs* has made it clear, however, that the issue of defendant's good faith intent and objectivity is not controlling. The inquiry must be directed to the actual consequences of the employment practice. Here, Rule 6, authorizing the discharge of employees whose wages have been garnisheed, discriminates against members of minority groups, in that it subjects a disproportionate percentage of members of those groups to discharge from employment.

The evidence of this fact is fully persuasive. A survey of the available information on wage garnishment reveals that minority group members suffer wage garnishments substantially more often than others, *i. e.,* the proportion of racial minorities among the group of people who have had their wages garnisheed is significantly higher than the proportion of racial minorities in the general population. *See, e. g.,* Wage Garnishment, Impact and Extent in Los Angeles County, Western Center on Law and Poverty (Los Angeles, 1970); Caplovitz, The Poor Pay More, The Free Press (New York, 1967).

The fact that blacks and other racial minorities are so often subject to garnishment action is related to the fact that they are to a disproportionate extent from the lower social and economic segments of our society. Approximately three times the proportion of blacks as compared to whites are in the lower end of the economic scale, due in large measure to racial discrimination. Minority group members are more often in debt, are more frequently subject to questionable credit practices and harassment, and have less capacity to defend themselves.

 It might be argued that wage garnishments primarily affect the poor

and only secondarily discriminate against racial minorities, and that Congress did not intend Title VII to reach this kind of discrimination. It may be that among persons on the same economic scale the wages of members of minority groups are garnisheed no more frequently than the wages of whites. The court has not been presented with any statistics on this matter, but it seems clear that the question is immaterial. The Supreme Court, in *Griggs,* repeatedly stressed that Congress' intention in Title VII was to invalidate all employment practices which in their final effect or consequence discriminate against racial minorities. A policy of dismissing employees whose wages are attached has this impermissible effect. The fact that it may also discriminate against the poor white is irrelevant to our consideration under Title VII.

Where the discrimination shown results, not from disparate treatment, but from the foreseeable effect of a policy neutral on its face, *Griggs* indicates that under some circumstances the policy may be justified by a showing of "business necessity". Such a showing is an affirmative defense on which the defendant has the burden of proof. In the present case, defendant corporation has argued that Rule 6 is justified on a number of grounds. Specifically, the defendant has argued that the dismissal policy is justified because of the expense and time attendant to responding to attachments and garnishments by various sections of the company's management and clerical staffs, because of the annoyance and time involved in answering letters and telephone calls from its employees' creditors, and, finally, because garnishments result in a loss of efficiency on behalf of the employee whose wages have been garnisheed.

The exact boundaries and contours of the phrase "business necessity" are still uncertain. The court, in Local 189, United Papermakers and Paperworkers v. United States, *supra,* stated that the policy or practice must be "essential to the safe and efficient operation" of the business. 416 F.2d at 989. In *Griggs,* the Court stated that a permissible practice must be one which can be shown to be "related to job performance" or "measuring job capability".

If the defendant's justifications of Rule 6 are examined in light of the Supreme Court's definition of business necessity, they are not sufficient. The sole permissible reason for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively. This approach leaves no room for arguments regarding inconvenience, annoyance or even expense to the employer. While the argument that wage garnishment results. in a loss of efficiency by the employee is entitled to consideration, the court cannot correlate wage garnishment with work efficiency. Certainly the argument that an employee whose wages are being partially withheld for the benefit of his creditors will apply himself less enthusiastically to his work is at its best only speculative. If he is an unproductive worker, he may be terminated because he is unproductive, but not for a supposedly causal relationship which has the effect of being racially discriminatory.

It might be argued that *Griggs* should not be followed since the question whether business necessity includes expense and inconvenience to the employer was not presented to the Supreme Court. While there may be in many situations a clear distinction between business necessity relating to job capability and business necessity relating to the employer's expense and inconvenience; it is submitted that the Court in *Griggs* intended the definition therein outlined to be exclusive. The Court liberally construed Title VII in order to implement the congressional directive that members of minority groups be insured equal opportunity in employment. All attempts to depart from this mandate must be carefully scrutinized. The Court has stated that the only permissible reason for tolerating discrimination is "business necessity" which is "related to job perform-

ance". The ability of the individual effectively and efficiently to carry out his assigned duties is, therefore, the only justification recognized by the law.

This result may seem harsh to the employer, but it is required by Title VII. In passing the 1964 Act, Congress was fully aware that putting an end to racially discriminatory employment practices would place a burden on employers in terms of their time, inconvenience and expense. One way to end racial discrimination throughout the society was to end it in employment, thereby opening better paying jobs to minority group members. The cycle of poverty and discrimination had to be broken someplace; employment, Congress decided, should be one of those places. The discrimination practiced against members of minority groups by an employer's policy of firing garnishees is not really intended by the employer. It is the result of broader patterns of exclusion and discrimination practiced by third parties and fostered by the whole environment in which most minorities must live. It may seem unfair that the employer should be made to suffer for the discrimination practiced by others. But this was the price Congress determined necessary to end discrimination. If the employer were permitted to discriminate because other employees, his customers or third persons, were prejudiced against minorities, the effort to break the desperate ring of discrimination would soon fail. Similarly, if the employer were permitted to discharge an employee because it cost a little more to attend to the clerical work when his wages are garnished, the effort to end discrimination would fail. Racial discrimination in employment cannot be tolerated, the expense or inconvenience in complying with the law notwithstanding.

Discharging an employee solely because his wages have been garnisheed once or several times benefits no one; the employer loses an otherwise capable employee and must expend considerable time and effort to train a replacement; the employee loses his source of income and may become dependent upon unemployment compensation or welfare; and the creditor is less likely to recover his claim. Congress has noted the frequently unscrupulous use of attachments and garnishments by creditors and has acted to forbid employers from discharging any employee whose wages have been garnisheed for any one indebtedness. 15 U.S.C. § 1674. In support of this act, Congressman Sullivan, Chairman of the House Subcommittee on Consumer Affairs, who held extensive hearings on this and related problems, stated:

> "What we know from our study of this problem is that in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up his pound of flesh, and being fired besides." 114 Cong.Rec. H688, Feb. 1, 1968. (Quoted in Sniadach v. Family Finance Corp., 395 U.S. 337, 341, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969).)

 Congress' action in enacting 15 U.S.C. § 1674 is not inconsistent with the interpretation of Title VII, as set forth herein. The fact that Congress forbids the discharge of an employee when his wages have been garnisheed for the payment of one debt does not imply that Congress meant to permit the discharge of members of minority groups whose wages have been garnisheed more than once. The crucial element of Title VII which is not present in § 1674 is race. Thus, reading the two acts together, Congress has not forbidden the discharge of an employee whose wages have been garnisheed several times except where such discharge is the result of discrimination against the employee on the basis of race, color, religion, sex or national origin.

It is, therefore, ordered that judgment be entered in accordance with the terms of the stipulation of the parties.

It is further ordered that the clerk this date shall serve copies of this memorandum opinion by United States mail upon the attorneys for the parties appearing in this action, as well as upon the Equal Employment Opportunity Commission.