Timothy KEENAN, Plaintiff-Appellant,

v.

AMERICAN CAST IRON PIPE COM-
PANY, Defendant-Appellee.

No. 81–8044.

United States Court of Appeals,
Eleventh Circuit.

June 23, 1983.

. Robert L. Wiggins, Jr., Birmingham, Ala.,
for plaintiff-appellant.

Thomas, Taliaferro, Forman, Burr &
Murray, J. Fredric Ingram, Birmingham,
Ala., for defendant-appellee.

Before TJOFLAT, HILL and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff-Appellant Timothy Keenan filed suit against his former employer, American Cast Iron Pipe Company ["ACIPCO"], alleging that its garnishment policy violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq.* ["Title VII"] and 42 U.S.C.A. § 1981. ACIPCO's garnishment policy provides that employees who are garnished will be disciplined by receiving reprimands for the first and second garnishments and will be discharged for the third. Disciplinary action is waived if the employee presents a written release within three working days from the date on which the notice of garnishment is received. All garnishments filed against an employee in a single pay period and all garnishments arising from a single indebtedness are considered as a single garnishment. Garnishments remain active for one year for the purpose of applying discipline. The policy only applies to garnishments arising out of contractual debts; it is not applicable to garnishments resulting from alimony or personal injury judgments.

Keenan worked for ACIPCO from July 25, 1969, until January 4, 1973, when he was discharged for violating the garnishment policy. Keenan was garnished on September 15, 1972, September 27, 1972, and December 4, 1972. Evidence was also presented at trial regarding the total number of employees by race who had been either reprimanded or discharged under the garnishment policy. The district court held that Keenan failed to prove a prima facie case of discrimination, stating that the statistics were too small to be reliable because only a few employees were discharged under the policy in any given year. Class certification was denied in the pretrial order because there were not enough discharged employees to meet the numerosity requirement of Federal Rule of Civil Procedure 23(a).

In ruling on both the class certification and the prima facie case, the district court effectively ignored the evidence concerning the employees who had received only reprimands, even though it stated in its pretrial order that injunctive relief would be available against the garnishment policy if the plaintiff prevailed, implying that it was considering the data for both reprimanded and discharged employees. At the outset of the trial the parties indicated to the court that they disagreed about whether the reprimand data should be considered along with the discharge statistics, but the court never indicated that it accepted either party's position. Although a substantial portion of the trial was devoted to the dispute about whether the discharge data was statistically significant, the reprimand data was also introduced and discussed at trial. One reason that the reprimand data did not receive as much attention as the discharge data is that the defendant's expert conceded that when the reprimand data is included the rate of garnishment for black employees is significantly higher than the rate for white employees. Furthermore, the small sample problem is eliminated because over three hundred employees received one or two garnishments in the relevant time period, even though only a small number received three. The question facing this Court is whether the district court erred by not considering the garnishment policy as a whole in ruling on class certification and in deciding whether Keenan had proved a prima facie case of racial discrimination.

1. The Prima Facie Case

There are only a few reported cases where garnishment policies have been challenged. None of the cases reached the issue of disciplinary action short of discharge because the courts found prima facie cases by taking judicial notice of garnishment practices. In the seminal garnishment case, *Johnson v. Pike Corporation of America,* 332 F.Supp. 490 (C.D.Cal.1971), the court held that a company policy of discharging employees "after several garnishments" violated Title VII, even though apparently no statistical evidence was presented demonstrating the specific disparate impact of the defendant's policy on its employees. The

court concluded that the policy "subjects a disproportionate percentage of members of [minority] groups to discharge from employment," 332 F.Supp. at 494, relying on articles that revealed that blacks and other racial minorities are more frequently garnished and census data showing that minority groups "are to a disproportionate extent from the lower social and economic segments of our society." *Id.* The rationale and conclusion of *Johnson* was adopted by the Equal Employment Opportunity Commission ["EEOC"] in a decision which held that "a policy of discharging an employee solely because his or her wages have been garnisheed will have an adverse impact upon minority group persons as a class." EEOC Decision No. 74–27, 2 CCH Empl. Prac. Guide ¶ 6396 at 4062 (1973). This broad holding was based on the same evidence adduced in *Johnson* and, as in *Johnson,* was not predicated on the operation of the particular defendant's policy. Perhaps due in part to the declared position of the EEOC, the defendant company in another garnishment case, *Wallace v. Debron Corp.,* 494 F.2d 674 (8th Cir.1974), conceded that its garnishment policy would subject a disproportionate number of blacks to discharge and concentrated on proving that the rule was justified by business necessity.

No Fifth [1] or Eleventh Circuit cases have addressed garnishment policies, but a similar rule, authorizing the disciplining of employees who fail to pay their "just debts," was challenged in *Robinson v. City of Dallas,* 514 F.2d 1271 (5th Cir.1975). Finding that only a few employees had been disciplined under the "just debts" rule, the Court held that the plaintiff had failed to prove that the rule had a discriminatory racial effect. In *Robinson* the discipline imposed on the plaintiff was a five-day suspension without pay; the Court declared that the suspension "was a sufficient employment practice to fall within Title VII." 514 F.2d at 1272.

We are unable to discern the basis for the district court's refusal to consider the entire garnishment policy since it did not explain its reasons. ACIPCO argued at trial and on appeal that the reprimand data should not be considered because the only effect of the policy is in its final result, discharge. However, an examination of the record convinces us that the evidence offered at trial indicates that the reprimands may be sufficiently akin to the discipline in *Robinson, supra,* to come within the scope of Title VII. Title 42, Section 2000e–2, provides that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." In determining whether an employment practice is within the scope of Title VII, it is instructive to note the interpretation given to this language by Judge Goldberg in *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

This language evinces a Congressional intention to define discrimination in the broadest possible terms. Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso the parameter of such nefarious activities. Rather, it pursued the path of wisdom by being unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable practices of the present can easily become the injustices of the morrow. Time was when employment discrimination tended to be viewed as a series of isolated and distinguishable events, manifesting itself, for example, in an employer's practices of hiring, firing, and promoting. But today employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discriminatory employment practices are no longer confined to bread and butter issues. As

---

**1.** Decisions of the Fifth Circuit handed down prior to September 30, 1981, are binding precedent on this Court unless and until overruled or

modified by this Court *en banc. Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

wages and hours of employment take subordinate roles in management-labor relationships, the modern employee makes ever-increasing demands in the nature of intangible fringe benefits. Recognizing the importance of these benefits, we should neither ignore their need for protection, nor blind ourselves to their potential misuse.

Consistent with the broad language and the remedial purpose of Title VII, there are at least two reasons why reprimands under ACIPCO's garnishment policy might properly be included within its parameters.

■ First, the disciplinary nature of the reprimand may so affect the conditions of employment as to make the reprimands cognizable under Title VII. Because Title VII protects an employee's psychological as well as economic well-being, *Rogers v. EEOC, supra,* 454 F.2d at 238, and because it is not necessary for a protected employee to demonstrate a "tangible job detriment," *Henson v. City of Dundee,* 682 F.2d 897, 901 (11th Cir.1982), to prove a violation of Title VII, a reprimand that has a meaningful adverse effect on an employee's working conditions may be prohibited. Although whether the reprimands in this case rise to that level is a factual determination that must be made by the district court, several factors in the record should be identified to aid the district court's analysis. The term reprimand itself connotes punishment. Although ACIPCO insists that the reprimands are nothing more than a "notice" to the employee, at oral argument counsel could not offer any reason why they are not simply called notices rather than reprimands. Furthermore, the tone of the policy suggests that the reprimand is intended to be punitive, as exemplified by the following passage: "All of us should make a conscientious effort to meet our just and honest financial obligations. It must not be expected that the Company can retain any employee whose disrespect for these obligations subjects the company to the annoyance and expense of processing frequent garnishments." Reinforcing the conclusion that the disciplinary aspects of the policy may affect conditions of employment is the fact that the policy states that each unreleased garnishment is filed for record with the time office, the employee's department head and the personnel department. Since there is no provision in the policy for the expunging of the garnishment from an employee's record, it is possible that the garnishment can affect promotion or other employment decisions made by supervisors who have access to those files.

■ The record also suggests that the reprimands might affect an employee's "terms, conditions, or privileges of employment" within the meaning of Title VII through the denial of credit. The garnishment policy provides that "[t]he garnisheed employee's credit privileges [2] with the Company, except for prescribed drugs, shall be suspended upon initiation of disciplinary action and shall not be reinstated until sixty days after the garnishment has been satisfied." The only testimony at trial about this provision was from Mr. Wayne Taft, the senior time checker, who testified that an employee's credit is suspended only when the credit deductions make it impossible to deduct the garnishment payment. This apparent contradiction between the face of the policy and Taft's testimony must of course be resolved by the district court. However, if the district court finds that a first or second garnishment triggers a suspension of credit, the reprimand may constitute a denial of a fringe benefit. Fringe benefits are included in Title VII's "terms, conditions, or privileges of employment." *See City of Los Angeles v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (pension plan). The EEOC has so declared in its guidelines on sex discrimination. 29 C.F.R. § 1604.9. The statutory enumeration of fringe benefits in the EEOC regulations does not include credit privileges, but the definition is broad enough to cover items that are not specifically listed.

---

**2.** It appears that ACIPCO provides an extensive credit network for its employees. Mr. Taft testified that the company has a credit union, a company store that has four different accounts, and a medical department with two different accounts.

The definition section, 29 C.F.R. § 1604.-9(a), provides: " 'Fringe benefits,' as used herein, includes medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions, and privileges of employment." An expansive reading of this definition accords with Judge Goldberg's observation in *Rogers, supra,* that "the modern employee makes ever-increasing demands in the nature of intangible fringe benefits." 454 F.2d at 238. Even though the EEOC regulation states that it is unlawful for an employer to discriminate between men and women with regard to fringe benefits, there is no reason why the regulation cannot also apply to race discrimination. The probable reason that the EEOC guideline by its terms is limited to sex discrimination is that fringe benefit plans seldom, if ever, make overt distinctions based on race, color, religion, or national origin.

Because the defendant's garnishment policy results in the discharge of only a few employees each year, the consideration of the discharge data alone prevented Keenan from proving that the policy has a racially discriminatory effect. However, Keenan alleged that the policy as a whole should be considered, and he was entitled to at least an explanation of why part of his evidence was ignored. If necessary, the district court should conduct an evidentiary hearing to ascertain the effects of the reprimands and to determine whether they fall within the scope of Title VII.

## 2. Class Certification

The district court abused its discretion in refusing to certify a class of employees who had been reprimanded or discharged for violating ACIPCO's garnishment policy. Because we are directing the district court to consider the data for all employees who have been disciplined under the policy, the numerosity requirement of Rule 23(a) is met. Each of the other requisites of Rule 23(a) is satisfied: there are questions of law and fact common to both those reprimanded and those discharged; Keenan's claim is typical of the class since he was reprimanded and discharged; and it appears that Keenan will adequately protect the interest of the class.

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.