UNITED STATES of America et al.,
Plaintiffs-Appellees,

v.

CITY OF CHICAGO et al.,
Defendants-Appellants.

Nos. 76–1113, 76–1152, 76–1205
and 76–1344.

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1976.

Decided Jan. 11, 1977.

Leon Despres, Norman J. Barry, Wayne B. Giampietro, Richard M. Gutman, Richard J. Phelan, Sp. Asst. Corp. Counsel, William R. Quinlan, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Ilana Diamond Rovner, Asst. U. S. Atty., Earl L. Neal, Chicago, Ill., Donald Pailen, Dept. of Justice, Washington, D. C., Kay Simon Grossman, Michael L. Meyer, Frank Cicero, Jr., Chicago, Ill., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, SWYGERT and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

This case is a consolidated civil rights action broadly challenging the employment practices of the Chicago Police Department. The district court in its January 5, 1976 memorandum decision found that the method utilized by the Police Department in hiring and promoting police officers resulted in discrimination against blacks, Hispanics, and women in violation of federal civil rights statutes and the Constitution. On February 2, 1976 the court entered a final

order which enjoined those employment practices found to be discriminatory, imposed numerical hiring and promotion quotas, and continued its injunction against payment of federal revenue sharing funds to the City of Chicago pending compliance with the court's order. The defendants challenge both the court's findings of discrimination and its choice of remedies.

## I

We will briefly review the proceedings in the district court, which have been thoroughly detailed in previously reported decisions.[1]

On September 9, 1970 Renault Robinson, a black Chicago police officer, and the Afro-American Patrolmen's League[2] filed a complaint against the Superintendent of Police, the City of Chicago, and the members of the Police Review Board charging racial discrimination in the assignment, promotion, and discipline of Chicago police officers.[3] The Robinson plaintiffs sought declaratory and injunctive relief and damages under the first, fifth, thirteenth, and fourteenth amendments to the Constitution, and under the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983.

A second action was brought on May 13, 1973 against the City, the Superintendent of Police, and the Chicago Civil Service Commission and its Secretary by Tadeo Robert Camacho and ten blacks and Hispanics who were unsuccessful applicants for positions as Chicago police officers. The Camacho plaintiffs challenged the full range of departmental practices with respect to recruiting, screening, and hiring. They sought relief under 42 U.S.C. §§ 1981 and 1985, the fourteenth amendment, and Titles VI and VII of the Civil Rights Act of 1964 (which had been amended and made

applicable to municipalities in 1972), 42 U.S.C. §§ 2000d and e.

A third suit was filed August 14, 1973 by the United States against the City, the Superintendent of Police, and the Chicago Civil Service Commission alleging a pattern and practice of discrimination within the Chicago Police Department against blacks, Hispanics, and women in the hiring, assignment, promotion, and discipline of police personnel. The Government sought relief under Title VII, under sections 1981 and 1985, and under the anti-discrimination guidelines and regulations of the Department of Justice and the Law Enforcement Assistance Administration, 28 C.F.R. §§ 42.201 et seq. and 42.301 et seq. Upon plaintiffs' joint motion, the three cases were consolidated in the district court before Judge Prentice H. Marshall.

An evidentiary hearing on plaintiff's motion for a preliminary injunction commenced on May 30, 1974. Plaintiffs sought to restrain further hiring by the City from the patrolman's eligibility roster and further promotion to the rank of sergeant from the sergeant's eligibility roster. The patrolman's eligibility roster was based on the results of the 1971 patrolman's examination given by the Chicago Civil Service Commission and a series of physical and medical tests. The sergeant's eligibility roster was based on the results of the 1973 sergeant's examination given by the Commission, departmental efficiency ratings, and seniority. Plaintiffs claimed both examinations, as well as other criteria used by the Police Department in hiring and promotion, improperly discriminated against black and Hispanic candidates. In addition, the Government sought preliminary relief against the disparate treatment of women within the Department. Just prior to the hearing, Louis Arado and other police offi-

---

1. *United States v. City of Chicago*, 411 F.Supp. 218 (N.D.Ill.1976); 395 F.Supp. 329 (N.D.Ill. 1975); 385 F.Supp. 543 (N.D.Ill.1974).

2. The League is an association formed by members of the Chicago Police Department to represent the interests of black police officers and the black community.

3. The original complaint, which also challenged the Department's hiring practices, was dismissed by the district court. The action proceeded on an amended complaint without allegations with respect to hiring.

cers who held positions on the 1973 sergeant's eligibility roster were permitted to intervene as defendants.

The preliminary injunction hearing consumed seventeen trial days. During the hearing, a consent decree was entered which resolved challenges to the Police Department's physical and medical requirements. On November 7, 1974 the district court issued findings of discrimination in hiring and promotion and preliminarily enjoined the defendants from utilizing practices that discriminated against minorities and women. The court also specifically prohibited any further hiring or promotion from eligibility rosters based on the 1971 patrolman's and the 1973 sergeant's examinations. Relying on representations by the City that a new patrolman's examination was being developed, the court declined to impose any preliminary hiring or promotion quotas.

A fourth action alleging employment discrimination in the Chicago Police Department was filed on February 7, 1974 in the district court for the District of Columbia against the Secretary of the Treasury and the Office of Revenue Sharing.[4] In this action plaintiffs Robinson, the Afro-American Patrolmen's League, and the National Association for the Advancement of Colored People sought to enjoin further payment of revenue sharing funds earmarked for the City of Chicago under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. §§ 1221 et seq. They alleged that a substantial portion of funds paid to the City of Chicago under the Act were being allocated to the Police Department, that the Police Department was engaged in discriminatory employment practices, and that payment of further funds to the City was consequently prohibited by the nondiscrimination provision of the Act, 31 U.S.C. § 1242. This suit was brought because the plaintiffs were dissatisfied with the response of the Secretary and the Office of Revenue Sharing to

an administrative complaint filed in September 1973.

On May 29, 1974 the Secretary responded to the administrative complaint and recommended to the Attorney General, pursuant to 31 U.S.C. § 1242(b), that he bring a civil suit against the City. The Government accepted this recommendation on May 30, 1974 by amending its complaint in the Northern District of Illinois to allege violations of the Fiscal Assistance Act.

The District of Columbia district court then initially denied the requested injunctive relief on June 28, 1974, reasoning that the Secretary had already fulfilled his statutory duty. Following entry of the preliminary injunction against the Chicago defendants in the proceedings in the Northern District of Illinois, however, the District of Columbia court reconsidered plaintiffs' motion for injunctive relief. In reliance on Judge Marshall's findings, the court on December 18, 1974 enjoined further payment of revenue sharing funds to the City until such time as the Secretary and the Office of Revenue Sharing determined that the Police Department was in compliance with the nondiscrimination provision of the Fiscal Assistance Act. Subsequently the City intervened in the District of Columbia proceedings and unsuccessfully sought modification of that court's order. The action was then transferred at the City's request from the District of Columbia to the Northern District of Illinois, where it was consolidated with the other cases pending against the City. In the following months, the district court twice denied motions by the City to modify the order forbidding payment of revenue sharing funds.

While the parties litigated the revenue sharing question, the original actions moved forward. After extensive negotiations, all interested parties consented to an interim hiring agreement that permitted the City to hire six hundred police officers from the 1971 patrolman's and the 1972 police woman's/matron's lists in three groups of two

---

4. The details of these proceedings are set out in the district court's decision in 395 F.Supp. 329 and in our own decision in a prior interlocutory appeal in this case, 534 F.2d 708 (7th Cir. 1976).

hundred, with one hundred positions in each group to be filled by minority male candidates, thirty-three by women, and the remaining sixty-seven by white males. The court approved the agreement on December 16, 1974. The City then notified the first group of two hundred to report to the police training academy on January 6, 1975. However, on January 2 the City unilaterally suspended the interim hiring agreement and instructed the previously notified applicants not to report for training. On March 10, the opening day of the trial on the merits, the City announced, again unilaterally, a new examination for patrol officers and a program for the appointment of temporary sergeants not be selected from the 1973 sergeant's list. Plaintiffs moved to enjoin the promotion of temporary sergeants, but this motion was denied on June 6. The court, however, did grant in part the motion of the Camacho plaintiffs to compel compliance with the interim hiring agreement. On April 21 it ordered the City to proceed with the suspended hiring of the two hundred applicants previously notified. It declined, however, to enforce the remainder of the agreement because of the City's assurance that results of the new patrolman's examination soon would be forthcoming.

The trial on the merits in the four consolidated cases began on March 10, 1975. Prior to trial the court allowed the intervention as plaintiffs of Carolyn Burauer and other named individuals who aspired to become police officers and who charged that they had been the victims of discrimination because they were women. It also permitted Roy Isakson and others who held positions on the 1971 patrolman's eligibility roster to intervene as defendants. All parties agreed that evidence adduced at the evidentiary hearing on the motion for a preliminary injunction would be considered as part of the trial on the merits pursuant to Fed. R.Civ.P. 65(a)(2).

On January 5, 1976 the district court entered a memorandum decision reaffirming in most respects the preliminary findings of discrimination in hiring and promotion made in its November 1974 decision. It found no discrimination, however, in the Police Department's procedures governing promotion to the rank of lieutenant and found no racial discrimination in the Department's assignment of personnel. It deferred final decision on the allegations of discrimination in discipline and on the personal claims of the Robinson plaintiffs.

In its implementing order of February 2, the district court made permanent the principal aspects of the preliminary injunction. To fill immediate vacancies in patrol officer ranks, it ordered the hiring of four hundred patrol officers pursuant to the uncompleted portion of the interim hiring agreement and authorized further hiring from the 1971 patrolman's list and the 1972 policewoman's/matron's list in accordance with the racial and sexual percentages specified in that agreement. The court also permitted the appointments of temporary sergeants to be made permanent.

In addition, the court imposed racial and sexual quotas on future hiring and promotion as a long term goal to remedy the past effects of discrimination. It required that at least sixteen percent of new patrol officer vacancies be filled by women and that at least forty-two percent of those vacancies be filled by black and Spanish-surnamed men. The City was permitted, though not required, to utilize persons remaining on the 1971 and 1972 rosters in filling vacancies after these quotas were satisfied.

The court further ordered that forty percent of the officers promoted to sergeant be black or Spanish-surnamed. The City was allowed at its option to use the 1973 roster in determining who would be promoted after this guideline was met.·

Finally, the court continued the withholding of federal revenue sharing funds until the City brought itself into compliance with the nondiscrimination provision of the State and Local Fiscal Assistance Act. It ordered the parties to submit proposed timetables for the release of those funds subject to action by the City to cease its discriminato-

ry conduct and comply with the court's order.

## II

■ As a preliminary matter, the defendants contend that the Robinson complaint must be dismissed for lack of subject matter jurisdiction.[5] The Robinson complaint alleged general federal question jurisdiction under 28 U.S.C. § 1331 for violations of the first, fifth, and fourteenth amendments and civil rights jurisdiction under 28 U.S.C. § 1343(3) for violations of the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983. The district court concluded that no action lay for violation of section 1983[6] against the City or the Police Review Board since municipal corporations are not "persons" subject to suit under that provision. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The court held, however, that jurisdiction was proper both under section 1331 and under section 1981 through its jurisdictional counterpart, section 1343(3). *Robinson v. Conlisk*, 385 F.Supp. 529 (N.D. Ill.1974). We agree with these conclusions.

■ The availability of general federal question jurisdiction under section 1331[7] as an alternative to civil rights jurisdiction under section 1343 for a plaintiff alleging constitutional deprivations against a municipal corporation has been recognized by the Supreme Court and by this court. *City of Kenosha v. Bruno*, 412 U.S. at 514, 93 S.Ct. 2222; *Calvin v. Conlisk*, 520 F.2d 1, 8 (7th Cir. 1975), *vacated on other grounds*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Section 1331, however, unlike sec-

tion 1343, requires the plaintiff to meet a $10,000 amount in controversy requirement. The general principle governing dismissal for want of jurisdictional amount is that, unless the law gives a different rule, the sum claimed in good faith by the plaintiff at the time of filing controls. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1937); *Calvin v. Conlisk*, 520 F.2d at 9. The district court concluded that Robinson satisfied this test by alleging in good faith that he had lost $30,000 in pay because of the defendants' discriminatory acts. The court also found that the requirement was met by the good faith allegations of the Afro-American Patrolmen's League that it had suffered damages of $100,000 because defendants' discriminatory acts discouraged membership in and support for the League.

■ The City contends, however, that because the plaintiffs asked for damages only from the Superintendent of Police and merely requested injunctive and declaratory relief against the City and the Police Review Board, section 1331 jurisdiction is improper with respect to the City and the Board. We reject this argument. In a suit seeking injunctive relief, the amount in controversy is the value of the right to be protected or the extent of the injury to be prevented. 1 Moore's Federal Practice ¶ 0.96[3.–1] at 939. The Robinson plaintiffs have alleged that discriminatory practices by the City will, unless enjoined, cause them future damages well in excess of $10,-000. This is enough to satisfy the statute.

■ The district court alternatively found that subject matter jurisdiction with

---

5. There is no jurisdictional issue with respect to the other plaintiffs, since they all alleged violations of Title VII. The Robinson plaintiffs could not bring their action within the ambit of Title VII since that statute was not applicable to municipalities when they filed their complaint in 1970.

6. 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

7. 28 U.S.C. § 1331 provides in pertinent part:
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States.

respect to the claims made against the City and the Board could be grounded on section 1981[8] through section 1343(3), its jurisdictional counterpart, which has no amount in controversy requirement. We agree. As the court noted, the language, purpose, and legislative history of section 1981 differ substantially from those of section 1983. Unlike section 1983, which requires action under color of state law, section 1981, intended to enforce the thirteenth amendment, prohibits *all* racial discrimination which deprives any person of the "full and equal benefit of all laws." *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S.Ct. 2586, 2605, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437–444, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The exception from liability for municipalities that can be discerned from the legislative history of section 1983 is absent in the language or history of section 1981.[9] Moreover, it would be anomalous to hold that section 1981 proscribes racial discrimination by purely private actors but not by municipalities. *See Maybanks v. Ingraham*, 378 F.Supp. 913, 917 (E.D.Pa.1974).

### III

We turn now to the merits of this case. The district court held that the employment practices of the Police Department discriminated against racial minorities and women in violation of Title VII of the Civil Rights Act of 1964 and the equal protection clause. We shall evaluate the court's conclusions with respect to each of these sources of law proscribing discrimination.

8. Section 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

9. The City has cited cases in which an action brought against a municipal corporation under both sections 1981 and 1983 was dismissed for want of jurisdiction without separate consideration of the section 1981 claim. *See Flood v.*

In reviewing the court's decision, we are bound under Fed.R.Civ.P. 52(a) to accept findings of fact unless they are clearly erroneous. *Stewart v. General Motors Corp.*, 542 F.2d 445, 449 (7th Cir. 1976); *Prince v. Packer Mfg. Co.*, 419 F.2d 34, 36 (7th Cir. 1969). The statement that discrimination exists for the purposes of establishing liability under Title VII or under the Constitution, however, is as much a conclusion of law as a finding of fact. A distinction must be drawn between subsidiary facts to which the "clearly erroneous" standard applies, and the ultimate fact of discrimination necessary to trigger a statutory or constitutional violation, which is the decisive issue to be determined in this litigation. *See Stewart v. General Motors Corp.*, 542 F.2d at 449 (Title VII); *East v. Romine, Inc.*, 518 F.2d 332, 338–39 (5th Cir. 1975) (Title VII). Accordingly, we will make an independent examination of whether the Police Department's employment practices, as a matter of law, were proscribed under Title VII or the equal protection clause.

### A. THE MECHANICS OF HIRING AND PROMOTION WITHIN THE CHICAGO POLICE DEPARTMENT

Hiring and promotion within the Chicago Police Department is governed by state law. The Illinois Municipal Code, Ill.Rev. Stat. ch. 24, § 10–1–7, provides that applicants for positions in a municipal police force must take competitive examinations. The statute states that "[s]uch examinations shall be practical in their character,

*Margis*, 461 F.2d 253, 256 (7th Cir. 1972); *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973); *Percy v. Brennan*, 384 F.Supp. 800 (S.D.N.Y.1974). These cases merely held that a municipality is not a "person" within the meaning of the Civil Rights Act, citing *Monroe, City of Kenosha,* or *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). Because those cases construe section 1983, not section 1981, and because section 1981 in fact does not even speak in terms of a "person" as a defendant, we do not believe we are bound by previous decisions in which courts gave no consideration to the quite different language and history of section 1981.

and shall relate to those matters which will fairly test the relative capacity of the persons examined to discharge the duties of the positions to which they seek to be appointed, and shall include tests of physical qualifications and health, and when appropriate of manual skill." A roster of eligible candidates is then to be prepared from the results of the examinations, with rank on the roster to be determined by each candidate's scores. The roster is to include "the persons whose general average standing upon examination . . . is not less than the minimum fixed by the rules of . . . [the] commission, and who are otherwise eligible." Ill.Rev.Stat. ch. 24, § 10–1–12. When a vacancy occurs, it must be filled by the candidate standing highest on the roster. Ill.Rev.Stat. ch. 24, § 10–1–14. A person's name may be struck from the eligibility roster after two years. *Id.* If more than one examination is given within two years, however, or if the administering commission gives another examination after two years without striking from the roster the names of those remaining from the old examination, rank on the roster is to be determined by relative excellence without reference to the time of examination. Ill.Rev.Stat. ch. 24, § 10–1–12.

Pursuant to these statutory commands, the Chicago Civil Service Commission periodically administered a patrolman's eligibility examination to individuals who met certain age, height, weight, and residency requirements. The examination from which appointments were being made at the time the Government filed suit was administered on December 4, 1971. It was a two-hour written examination containing 120 multiple choice questions designed to test vocabulary, grammar, word choice, arithmetic, and verbal and mathematical reasoning. Those who received a passing score on the written examination were required to submit to a physical and medical examination. The names of applicants who passed the physical and medical screening were then posted on a patrolman's eligibility list in rank order according to their scores on the written test.

Whenever the Police Department needed patrolmen, the Commission supplied a list of names from the top of the eligibility list. The Department then conducted a background investigation of the individuals whose names had been supplied. An applicant was disqualified and removed from the eligibility list if the investigation proved that he had made false statements to the Commission or violated its rules in connection with his application or his examination, that he had ever been discharged from public employment for cause, or that evidence established his "bad character, dissolute habits, or immoral conduct."

The Municipal Code similarly provides that promotional rosters must be based on competitive examinations, as well as "ascertained merit" and seniority. Vacancies must be filled by one of the three candidates at the top of the roster, and a high-ranking candidate cannot be passed over more than twice. Candidates can be struck from the promotional roster after two years if there are no existing vacancies. Ill.Rev. Stat. ch. 24, § 10–1–13.

The Chicago Civil Service Commission accordingly required patrolmen who sought promotion to the rank of sergeant to take a written examination. The examination at issue in this case was administered on August 18, 1973, and contained one hundred multiple choice questions designed to test a candidate's knowledge of departmental regulations and procedures, and his judgment in situations that might confront a police sergeant. An eligibility roster was then derived from a weighted combination of scores on the written examination (sixty percent), recent patrolman efficiency ratings (thirty percent), and points for seniority (ten percent). Those who achieved a composite score of seventy were placed on the roster in rank order according to their composite scores. Promotions were to be made from the top of this list as positions became available.

The Illinois Municipal Code makes no distinction between the sexes in providing procedures for hiring and promotion to municipal police forces. Nonetheless, the Police

Department has always maintained sexually segregated procedures for hiring and promotion. For the purposes of this case, the hiring of women was based on the 1972 policewoman's/matron's list, derived from a separate examination. Based on the record, there appears to have been no organized procedure governing the promotion of women within the Department.

## B. TITLE VII

### 1. GENERAL PRINCIPLES

The basic legal standard to be utilized in litigation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* was developed by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and amplified in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In *Griggs,* the Court held that a test for employment or promotion having a disproportionately adverse effect on black applicants was unlawful under Title VII unless it was demonstrably related to job performance. The Court stated:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. 401 U.S. at 431, 91 S.Ct. at 853.

Therefore, a prima facie case of discrimination is established where evidence shows "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375. *Stewart v. General Motors Corp.,* 542 F.2d at 449. Upon such a showing of disparate effect on minority applicants, the burden shifts to the employer to show "that any given requirement [has] a manifest relationship to the employment in question," and that the "disparity [is] the product of nondiscriminatory factors." *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854; *Stewart,* 542 F.2d at 450. Where employment tests are at issue, courts have often required an employer to prove job-relatedness by evidence that the tests have been "validated" in accordance with the Guidelines issued by the Equal Employment Opportunity Commission and the professional standards of the American Psychological Association that the Guidelines adopt.[10] *See, e. g., Douglas v. Hampton,* 168 U.S.App.D.C. 62, 512 F.2d 976, 986 (1975); *United States v. Georgia Power Co.,* 474 F.2d 906, 913 (5th Cir. 1973). The Supreme Court has held that in considering evidence of job-relatedness the EEOC Guidelines are entitled to great deference as the administrative interpretation of Title VII by the agency designated to enforce it. *See Albemarle,* 422 U.S. at 430–31, 95 S.Ct. 2362; *Griggs,* 401 U.S. at 433–34, 91 S.Ct. 849.

Moreover, since Title VII explicitly prohibits sexual as well as racial discrimination, *see Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1970), the standards laid down in *Griggs* should be applied when sex, as well as race, is at issue. *See Bowe v. Colgate, Palmolive Co.,* 489 F.2d 896, 900 (7th Cir. 1973).

### 2. RACIAL DISCRIMINATION

The district court, in applying these standards, permanently enjoined further hiring and promotion from the 1971 patrolman's and the 1973 sergeant's eligibility rosters. This decision was based on the court's findings that the 1971 patrolman's examination, the Department's background investigation, and the 1973 sergeant's examination each had an adverse impact on minority candidates and that these selection devices had not been shown to be job-related. Based on an independent review of the record, we hold that the district court's conclusions were correct.

---

**10.** Guidelines on Employment Selection Procedures, 29 C.F.R. § 1607; American Psychological Association, Standards for Educational and Psychological Tests and Manuals (1966).

### a. DISPROPORTIONATE IMPACT

■ *Hiring.* The district court found that thirty-four percent of the total pool of applicants taking the 1971 patrolman's examination were black or Hispanic, but that only ten percent of the candidates actually hired from the 1971 roster at the time its use was suspended were members of those minority groups. In analyzing the evidence, the court also examined the separate components making up the hiring process within the Chicago Police Department, and determined that each of them had a discriminatory impact. We find the court's factual findings to be supported by substantial evidence and hold that the disparity produced by the combination of these components is enough to establish a prima facie case that the Department's employment practices were discriminatory in violation of Title VII.

■ The district court first looked at comparative success on the 1971 patrolman's examination and found that blacks and Hispanics failed at twice the rate of white applicants.[11] Defendants contend that this evidence is insufficient to show discrimination because plaintiffs failed to show that the disproportionate failure rate resulted from racial factors. This argument misconceives the legal standard to be utilized in determining whether a prima facie case of discrimination exists within the meaning of Title VII. Plaintiffs did not need to show that the examination was devised with the intent to exclude racial minorities or that a direct causal relationship exists between an applicant's race and his performance. Rather, plaintiffs needed only to show that the examination had an adverse impact on minority applicants as a group; at that point, the burden would be on the City to demonstrate that the examination in fact tested job-related qualifications. *See Griggs,* 401 U.S. at 431–32, 91 S.Ct. 849; *Albemarle,* 422 U.S. at 425, 95 S.Ct. 2362; *Stewart,* 542 F.2d at 450. *See*

*also Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ Second, the district court found that the Department's background investigation disqualified a significantly greater percentage of minority applicants than white applicants. For example, blacks were disqualified at twice the rate of white applicants because of a previous arrest record and at three times the rate of white applicants because of a negative employment record. Since 1968, 25.7 percent of the black applicants who underwent background investigations were disqualified as compared to 15.2 percent of the white applicants. Defendants assert that it was unsound for the district court to focus on the comparative failure rates of black and white applicants. Instead, they urge, the court should have compared the respective pass rates of the two groups. While black people were disqualified at approximately five-thirds the rate of white people, the white group only passed the background screening at about eight-sevenths the rate of the black group. The latter figure is less impressive than the former one for the purposes of establishing discriminatory impact.

This argument might be convincing if the district court had relied solely on the disparity in the results of the background screening in finding that the Department's employment practices were discriminatory. The court utilized the disparity in screening results, however, only in conjunction with other evidence in reaching its conclusion. It was certainly entitled to do this, whether it viewed the statistics in terms of passing or failing. *See Green v. Missouri Pac. R.R.,* 523 F.2d 1290, 1294–95 (8th Cir. 1975). Moreover, the court's ultimate finding was based on the percentage of white applicants actually hired in contrast to the percentage of minority applicants hired. This emphasis on selection rather than disqualification conforms with the defendants' wishes.

---

**11.** Black and Hispanic applicants failed the examination at rates of 67 percent and 68 percent while only 33 percent of the white applicants failed. In addition, those minority applicants who passed the examination tended to score lower than whites, further reducing their chances for employment.

■ *Promotion.* The district court's finding that the use of the 1973 sergeant's roster had an adverse impact on minority groups is also supported by substantial evidence. Of the 6,555 patrolmen who took the 1973 sergeant's examination, 1,298 were black or Hispanic. While 1,918 patrolmen achieved a passing composite score of seventy by combining their examination score and points for efficiency ratings and seniority, the parties agreed, based on previous experience, that only four hundred of those who passed had any chance for promotion. Only twenty-nine of these first four hundred men were black or Hispanic. Thus, 2.23 percent of the minority candidates taking the examination had a practical chance of being promoted compared to 7.07 percent of the white candidates.[12] We agree with the district court that a prima facie case of discrimination can be based on this disparity.

Defendants mount two principal attacks on the validity of these statistics. First, they assert that the difference between the average performance of black and white candidates on the written examination is too slight to support an inference of discrimination. This argument misses the point, for it is the impact of the examination on the racial composition of the first four hundred finishers, not the average impact, that is significant. The ultimate question is whether substantially fewer minority patrolmen than white patrolmen were promoted to the rank of sergeant, and average scores are irrelevant in answering that question.

Second, defendants attack the district court's reliance on combined statistics for blacks and Hispanics, contending that separate statistics indicate that Hispanic candidates for promotion in fact were as successful as whites on the examination both in terms of pass rate and practical success rate. Even assuming that this contention is correct, however, plaintiffs have still made out a prima facie case that the examination produced a discriminatory impact. If black and Hispanic candidates are considered separately, the adverse impact which the testing procedure had on blacks is even more striking: only 1.77 percent of the black candidates, compared to 7.07 percent of the white candidates, made the top four hundred places on the roster. Defendants' argument only goes to the appropriateness of including Hispanics in the remedy to be imposed to correct discrimination in promotional practices.

### b. JOB–RELATEDNESS

The defendants attempted to justify the use of the selection and promotion practices that excluded minority candidates at disproportionate rates by introducing statistical studies and expert opinion evidence purporting to establish the job-relatedness of the challenged devices. The district court found that the validity studies offered by defendants failed to comply with the requirements of the EEOC Guidelines and APA Standards for test validation and that defendants' experts failed to establish that any of the selection and promotion devices were demonstrably job-related.

■ On appeal the defendants seek to challenge the district court's conclusions by relitigating the probativeness of the evidence introduced and rejected at trial. The findings of the trial court with respect to this evidence—statistical studies and the testimony of expert witnesses—are perfect examples of subsidiary facts to which the clearly erroneous standard applies. As this court has observed, "[t]he resolution of such evidentiary conflicts is the precise function for which our trial courts sit [and it] is only necessary for us to determine on review whether the findings supporting the judgment have an evidentiary basis." *Harry Alter Co. v. Chrysler Corp.,* 285 F.2d 903, 906 (7th Cir. 1961); *Prince v. Packer Mfg. Co.,* 419 F.2d 34, 36 (7th Cir. 1969). We should reverse the district court's findings only if, with due deference to the trial

---

12. The disproportionate impact on minority applicants is attributable to the written examination since the district court found that neither the efficiency ratings nor the seniority factor had an appreciably differential impact on minorities.

judge's resolution of conflicting evidence and to his determination of credibility, we are left with the definite and firm conviction that a mistake has been committed. *Guzman v. Pichirilo,* 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). We conclude that no mistake has been made and affirm the findings of the district court.

■ *The 1971 Patrolman's Examination.* Defendants sought to show that the 1971 patrolman's examination was job-related through the testimony of an outside expert commissioned by the City to conduct a validity study of the 1971 examination.[13] This was a "criterion validity" study designed to determine whether scores on patrolman's entry examinations correlated with subsequent performance on the job measured by criteria selected to indicate job success.[14] Comparisons were made between success on the examinations and four criteria: (1) patrolman efficiency ratings, (2) departmental awards, (3) disciplinary actions, and (4) performance on sergeant's promotion examinations and actual promotion to command ranks. Although the defendants' expert testified that this study established the validity of the patrolman's examination, we are persuaded that the district court properly rejected this evidence under the governing EEOC Guidelines. Compliance with these Guidelines is generally required absent some showing that a cogent reason exists for noncompliance. *United States v. Georgia Power Co.,* 474 F.2d 906, 913 (5th Cir. 1973).

The correlations between the examinations and each criterion failed to meet minimum professional requirements. The study showed no correlation between test performance and disciplinary actions. There was some correlation with efficiency ratings, but it did not reach the level of statistical significance required by the EEOC Guidelines to ensure it was attributable to some factor other than chance. *See* 29 C.F.R. § 1607.5(c)(1).

The study did discover a small but statistically significant correlation between test performance by white applicants and departmental awards, but found no correlation for that criterion with respect to black applicants. The EEOC Guidelines require, where technically feasible, that an examination be separately validated for both minority and nonminority candidates. 29 C.F.R. § 1607.5(b)(5). The Supreme Court in *Albemarle* cited this Guideline with approval. 422 U.S. at 435, 95 S.Ct. 2362. *See also Rogers v. International Paper Co.,* 510 F.2d 1340, 1350 (8th Cir.), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Georgia Power Co.,* 474 F.2d at 913–14. Since an adequate minority sample made differential validation in this study technically feasible, the Guidelines were not satisfied.

■ The only valid correlation revealed by the study was between success on the patrolman's examination and subsequent success on the sergeant's examination, leading to promotion to command ranks. Under the EEOC Guidelines, however, promotability is a proper criterion for validation only where the "great majority" of employ-

---

13. The expert principally relied on results of the 1970 patrolman's examination, which was accepted by the court and the parties as the substantial equivalent of the 1971 test. We note that the 1970 examination had the same disproportionate effect on minorities as the 1971 examination, disqualifying blacks at the rate of 77 percent, Hispanics at 70 percent, and whites at 42 percent.

14. The Supreme Court has recently described the professionally recognized methods for validating employment tests:

Professional standards developed by the [APA Standards, *supra* note 10] accept three basic methods of validation: 'empirical' or 'criterion' validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified), 'construct' validity (demonstrated by examination structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance), and 'content' validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant). (Emphasis added). *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2051, n. 13, 48 L.Ed.2d 597 (1976).

ees can expect promotion within a "reasonable period of time." 29 C.F.R. § 1607.-4(c)(1). This approach was endorsed by the Supreme Court in *Albemarle.* 422 U.S. at 434, 95 S.Ct. 2362. The district court found that only four hundred out of twelve thousand patrolmen could expect promotion within a reasonable time,[15] negating the importance of any correlation between performance on the two examinations. Moreover, the EEOC Guidelines discount promotability as a valid criterion when the potential of employees to perform high level jobs will change over time. 29 C.F.R. § 1607.4(c)(1). This would certainly be the case with a patrolman's ability to perform command duties, because some patrolmen will gain more from experience than others.

The study suffers from a further inadequacy in that it failed to comply with 29 C.F.R. § 1607.5(b)(3), which requires that the criteria used to predict job performance "must represent major or critical work behaviors as revealed by careful job analyses." *See Albemarle,* 422 U.S. at 432 n. 30, 95 S.Ct. 2362. As the APA Standards note:

> [T]he logic of criterion-related validity assumes that the criterion possess validity. All too often, tests are validated against any available criterion with no corresponding investigation of the criterion itself. The merit of a criterion-related validity study depends on the appropriateness and quality of the criterion chosen . . . . Criterion-related validity studies based on the 'criterion at hand' chosen more for availability than for a

place in a carefully reasoned hypothesis, are to be deplored. APA Standards at 27.

No job analysis of the position of patrolman was conducted before the 1971 examination or the 1974 validity study, indicating that the criteria used in the study were in fact chosen for their availability rather than because they would accurately predict job performance. The Civil Service Commission's Secretary, Dr. Pounian, testified that a job description of several paragraphs was maintained and updated from time to time, but this was not introduced into evidence. Furthermore, both the efficiency ratings and the 1973 sergeant's examination which the study used as criteria cf job performance were found by the district court not to be job-related.[16]

Defendants, relying on the Supreme Court's recent decision in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), assert that the district court erred in rejecting evidence that performance on the patrolman's examination correlated with success in the police training academy as proof of job-relatedness.[17] The Supreme Court in *Washington* held that under the nondiscrimination statutes applicable in that case,[18] a police department may use an entry test that predicts success in a required training program even if that test is not shown to predict job performance. Although the applicability of the Court's holding to cases arising under Title VII is not clear,[19] even if a relation-

---

**15.** This statistic is supported by the accepted evidence that only fifty to one hundred patrolmen are promoted to the rank of sergeant each year. Defendants challenge the statistics relied on by the district court and cite statistics indicating that the ratio of promoted persons to patrolmen is one to 3.5. Even these statistics, however, do not establish that the "great majority" of patrolmen can expect promotion and that promotion will occur within a reasonable time.

**16.** Although the court eventually concluded that the efficiency ratings were not discriminatory, that conclusion was based on the absence of a clear disparate impact rather than on convincing evidence of their reliability as measures of job performance.

**17.** In its decision granting the preliminary injunction, the district court stated:

> Finally, defendants sought to show a correlation between the results of the 1971 patrolman's exam (and earlier exams) and performance in the police academy. Again one would expect a correlation between performance on written exams. But significantly, defendants established no corresponding correlation between academy performance and patrol job performance. 385 F.Supp at 556.

**18.** D.C.Code § 1–320; *see also* the Federal Civil Service Act, 5 U.S.C. § 3304a.

**19.** *See* 96 S.Ct. 2040 (Stevens, J., concurring).

ship between examination performance and police academy performance would be enough to establish job-relatedness for Title VII purposes, we do not read the district court's opinion as expressing a finding that such a relationship exists.

 Moreover, we cannot find convincing proof of this relationship in the record before us. The only evidence that would support such a finding is testimony by Dr. Pounian at the preliminary injunction hearing that studies in the 1960's showed some correlation between earlier patrolman examinations and training academy success. No studies, however, were ever introduced into evidence.[20] Mere testimony that a test has been validated, without a record of validation, is insufficient to prove job relatedness. *Albemarle*, 422 U.S. at 428 n. 23, 95 S.Ct. 2362; 29 C.F.R. § 1607.4(a). We therefore conclude that the evidence was insufficient to establish a relationship between success on the 1971 patrolman's examination and performance in the police training academy.

 *The Background Investigation.* The district court found that the Department's background investigation, which disqualified applicants for employment without written regulations, standards, or guidelines, was not demonstrably related to job performance. Defendants assert that a background investigation to determine the fitness of individuals to serve in responsible positions of authority as municipal police officers is job-related on its face. We recognize that careful screening through investigation of an applicant's background can be a useful device in determining whether an applicant has the personal qualities required of a police officer. But we are persuaded that the district court properly concluded that the particular background in-

vestigation devised and administered by the Chicago Police Department did not achieve that purpose.

The Department's background investigation procedures required disqualification of applicants who evidenced "bad character, dissolute habits or immoral conduct." At trial, however, the administrative chief of the Department's investigation section was unable to define these criteria. The evidence showed that as part of the background investigation the Department inquires into an applicant's social status, financial condition, arrest and driving records, military, employment and educational background, and the arrest record of his family. Yet no evidence indicated what specific negative information in these areas would trigger disqualification. Moreover, as the district court correctly noted, courts have found disqualification or discharge in private sector employment to be impermissible when based on several of these factors. *See, e. g., Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir. 1972) (arrest); *Wallace v. Debron Corp.,* 494 F.2d 674 (8th Cir. 1974) (financial condition); *Johnson v. Pike Corp.,* 332 F.Supp. 490 (C.D.Cal.1971) (financial condition).

Job-relatedness can only be determined where the criteria for selection are clearly identified. Here, the vagueness of the governing criteria and the defendants' failure to offer any articulable standards to guide the application of these criteria make it impossible to determine whether the background investigation actually served to select applicants according to real differences in job-related qualifications. *See Afro-American Patrolmen's League v. Duck,* 503 F.2d 294 (6th Cir. 1974). Accordingly, the district court did not err in holding that defendants failed to demonstrate that the background screening procedure as adminis-

**20.** In their supplemental briefs, defendants rely on a section of the 1972 Law Enforcement Assistance Administration Report on discrimination in the Chicago Police Department that cites a 1968 study by the Department showing a correlation between entry examination success and scores on tests given in the training academy. The LEAA Report, however, was offered into evidence by plaintiffs over defendants' objection and was admitted on a limited basis upon a stipulation by the parties. The section on which defendants now seek to rely was not part of the stipulation and consequently was not before the district court nor before us on appeal.

tered by the Police Department was job-related.

*The 1973 Sergeant's Examination.* At the preliminary injunction hearing, defendants introduced expert testimony and statistical evidence which purported to establish the concurrent validity [21] and the content validity [22] of the 1973 sergeant's examination. To support a finding of concurrent validity, defendants offered into evidence a study conducted by Dr. Pounian, who administered the 1973 sergeant's examination to 176 incumbent Chicago police sergeants [23] and then computed the correlations between their scores and their most recent departmental efficiency ratings. Dr. Pounian testified that his computations established the concurrent validity of the sergeant's examination. His testimony was supported at trial by defendants' expert Dr. Philip Ash, who performed additional computations based on data from Dr. Pounian's study.

The district court rejected their conclusion because the study failed to meet the EEOC Guidelines. This finding was based on substantial evidence and we affirm it. First the use of efficiency ratings as the sole criterion against which the test was validated was defective under the Guidelines in view of the court's finding that those ratings did not accurately measure job performance.[24] *See* 29 C.F.R. §§ 1607.5(b)(3) and (c)(1). The entire rationale of a criterion-related study requires that the criterion with which test results are compared be a good measure of job performance. APA Standards at 27.

Second, even assuming the validity of the criterion used, the results of the study did not show any correlations for blacks at levels of practical significance. *See* 29 C.F.R. § 1607.5(c)(2). As we have already noted, the EEOC Guidelines require that an examination be validated for both minorities and whites. 29 C.F.R. § 1607.-5(b)(5). We do not consider this requirement a mere technicality. *See Albemarle*, 422 U.S. at 435, 95 S.Ct. 2362. Where a test excludes minorities from promotion at disproportionate rates, those who use the test must show that its use enhances their ability to predict job performance for minorities as well as whites and thus legitimately excludes minorities because of deficiencies in their qualifications for the job.

The district court also found that the validity of the study was undermined by serious problems as to Dr. Pounian's credibility. That finding is supported by substantial evidence and we will not disturb it.

The defendants further attempted to show that the sergeant's examination had content validity as well as concurrent validity. In support of a finding of content validity, Dr. Pounian testified that a comprehensive job analysis was developed in

**21.** Concurrent validation is a form of criterion-related validation. *See* note 14 *supra.* Two types of criterion-related validation are professionally recognized: (1) predictive validation, in which test scores are compared with subsequent performance on criteria selected to measure job performance, and (2) concurrent validation, where test scores are compared with current performance on job criteria. *APA Standards* at 26. While predictive validation is preferred, "data obtained in a concurrent study may be used to estimate the predictive validity of a test." *Id.*

**22.** "An examination has content validity if the content of the examination matches the content of the job." *Vulcan Society v. Civil Service Commission*, 490 F.2d 387, 395 (2d Cir. 1973). *See* note 14 *supra* ; APA Standards at 28.

**23.** The 176 sergeants included 88 black/white pairs matched according to age and efficiency ratings.

**24.** There was a good deal of testimony revealing the vagaries of the Department's means of measuring efficiency. *See* 385 F.Supp. at 560–61. The efficiency ratings were supposed to be computed from a checklist of separate ratings for quantity of work, quality of work, and other specified indicia of job performance. Defendants' experts computed correlations for each of these ratings as well as for the overall rating. However, supervisors often assigned the overall efficiency score and then manipulated the ratings for each factor to conform to that score. Thus, the specific ratings gave no better indication of actual job performance than the overall ratings.

preparation for the 1973 examination. From this analysis a sergeant's task list was drawn up, and these tasks were broken down into six areas to be covered on the examination: personnel supervision (twenty-five percent); community relations (ten percent); investigatory skills (ten percent); crowd control and special events (five percent); laws, rules, and regulations (twenty percent); and judgment (thirty percent). Dr. Pounian also testified that the items on the examination bore a direct relationship to the tasks performed by police sergeants in each area.

■ The district court found that the sergeant's examination lacked content validity, based on evidence derived from the concurrent validity study. Defendants' claim of content validity required them to show that the tasks on the examination substantially represented equivalent tasks on the job.[25] Yet the evidence indicates that incumbent sergeants performing successfully in their positions did not score well on the examination, even though it consisted of questions that allegedly tested functions which they perform regularly on the job. The concurrent validity study showed that when the 1973 sergeant's examination was administered to incumbent sergeants who were performing satisfactorily, their average score was only fifty-three percent, just two percent more than the average patrolman's score of fifty-one percent. The district court noted that the average sergeant could not have made the practical cut-off point on the sergeant's roster even with maximum seniority and a perfect one hundred percent efficiency rating.

In view of the conflicting evidence, the district court was not required to accept the conclusions of defendants' experts that the examination was valid. *See Vulcan Society v. Civil Service Commission,* 490 F.2d 387, 397 (2d Cir. 1973). The court could properly conclude that the evidence of the poor performance of incumbent sergeants on the

examination instead demonstrated that it was not content valid.

## 3. SEXUAL DISCRIMINATION

The unchallenged findings of the district court present a clear pattern of sexual discrimination in the Chicago Police Department. Women in the Department have been traditionally segregated into separate positions as policewomen or police matrons. The number of these positions has been severely limited. In August 1973 only 115 women held sworn positions within the Department, which employed at that time approximately 13,500 sworn personnel. At the time of the preliminary hearing in 1974, this number had increased to only 160, or about one percent of the Chicago police force. Policewomen and police matrons were principally assigned duties relating to the processing and custody of female prisoners and certain duties in the Youth Division. Women were not entitled to compete on the patrolman's entry examination nor assigned to patrol work. Only two women held command positions in the Department, and their authority extended only to other women. These established policies and practices continued after the 1972 amendments to Title VII brought municipalities within the ambit of that statute. Evidence that women have been "limited, segregated and classified" in employment within the department is undisputed in this case. These practices could be justified only by proof that sex is a bona fide occupational qualification of those positions from which women have been excluded. 42 U.S.C. § 2000e–2(e)(1); *Weeks v. Southern Bell Telephone and Telegraph Co.,* 408 F.2d 228, 232 (5th Cir. 1969); *Bowe v. Colgate, Palmolive Co.,* 416 F.2d 711, 715–16 (7th Cir. 1969). The City neither asserted nor attempted to prove that only men could perform the full range of police duties.

Instead, the City urges reversal of the district court's holding that the Department's practices violated Title VII on the

---

25. The EEOC Guidelines provide that evidence of the content validity of an employment test may be accepted as evidence of job relatedness for tests "that consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question." 29 C.F.R. § 1607.5(a).

ground that the initiation of a pilot program to study the feasibility of female patrol officers following the 1972 amendments to the Act was a "rational approach" to compliance. Even assuming that the supporters of the 1972 amendments envisioned some grace period for municipalities to meet the requirements of Title VII, however, the district court concluded, and we agree, that the City's actions did not exhibit an intent to promptly and voluntarily end discrimination. Under the 1972 amendments, Title VII became applicable to municipalities on March 21, 1972, and the Government brought suit alleging sexual discrimination on August 14, 1973. Yet not until June 1974 were the first women experimentally assigned to patrol duties under the pilot program. Not until April 1975 were women first entitled to compete with men on an entry examination for patrol officer positions. And not until June 1975 did the City announce a policy of nondiscrimination against women in Police Department assignments. Moreover, these latter actions were taken under compulsion of the court's November 7, 1974 preliminary injunction.

■■■■ The City further contends that it has not illegally discriminated against women because there is evidence of sexual discrimination in other law enforcement agencies. As the district court correctly observed, it is no defense to a charge of discrimination that not everyone else is in compliance with the law. We therefore affirm the district court's holding that sexual discrimination within the Police Department violated Title VII.

## C. THE EQUAL PROTECTION CLAUSE

The district court stated that:

[t]he evidence shows that the City defendants have knowingly engaged in racial and sexual discrimination in employment and promotion within the Chicago Police Department. Accordingly, they have knowingly violated the equal protec-

tion clause of the Fourteenth Amendment . . . . 411 F.Supp. at 245. We reverse the district court's holding of a constitutional violation as to racial discrimination and remand the constitutional sexual discrimination issue for further proceedings.

■■■■ Our disagreement with the district court on the racial discrimination issue is the result of the Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), handed down after the district court's final order. In *Washington*, the Supreme Court held that racial discrimination within the meaning of the equal protection clause could not be demonstrated solely by a racially disproportionate impact. Rather, the Court held, for constitutional purposes it is necessary to show an intent or purpose to discriminate by reason of race. Thus, the Court has differentiated between the standard necessary to prove a violation of Title VII and the standard required under the Constitution. Under Title VII a disproportionate racial impact remains enough to establish a prima facie case while under the Constitution evidence of intention must be proved. 426 U.S. at 238–39, 96 S.Ct. at 2046–47.

■■■■ There is no evidence in the record before us that the Chicago Police Department engaged in purposeful discrimination.[26] The Department merely followed the command of Illinois law in administering tests which on their face were racially neutral. When the district court stated that the City knowingly engaged in racial discrimination, it may have been referring to the fact that the Department must have been aware of the racially disproportionate impact of those examinations. Under *Washington*, this is not enough to show intent for purposes of the equal protection clause. *See* 426 U.S. at 245–48, 96 S.Ct. at 2050. Accordingly, we hold that the hiring and promotion policies of the Chicago Police Department did not violate the Constitution.

---

**26.** This statement is not intended to apply to the individual claims of the Robinson plaintiffs, which are not at issue in this appeal.

We remand the case to the district court as to the constitutional sexual discrimination issue because the district court, equating the equal protection clause with Title VII, failed to deal with the difficult problems which arise when a claim is made that a sex-based classification violates the equal protection clause. *See, e. g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); Note, *The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 49, 95–103 (1975). On remand, the district court should also face the question of whether the intent requirement which *Washington* imposed on claims of racial discrimination also applies to claims of sexual discrimination and if so, whether the plaintiffs have satisfied the requirement in this case.[27]

## IV

Based on its findings, the district court entered a final decree designed both to remedy the effects of past discrimination and to ensure that the City will comply with the law in the future. The City, the individual defendants, and the Burauer plaintiffs have appealed various aspects of the decree. We shall consider each of their contentions individually.

### A. MANDATORY QUOTAS

The City and the individual defendants challenge the propriety of the mandatory quotas for hiring and promotion which the district court imposed as long term goals. The court ordered the City to appoint at least sixteen percent females and forty-two percent black or[28] Spanish-surnamed males to fill future patrol officer vacancies. It also required that forty percent of the patrol officers promoted to the position of sergeant be black or Spanish-surnamed. These standards were to be in force until further order of the court.[29]

We hold that the district court did not abuse its discretion in imposing mandatory quotas upon the Police Department. Under Title VII Congress has equipped the courts with wide discretionary power to remedy statutory violations by fashioning the most complete relief possible. *See* 42 U.S.C. § 2000e–5(g); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Albemarle*, 422 U.S. at 421, 95 S.Ct. 2362. The district court had a duty to construct a remedy that would both eradicate as far as possible the past effects of discrimination and prevent discrimination in the future. *Albemarle*, 422 U.S. at 417–18, 95 S.Ct. 2362. Moreover, even though Title VII did not become applicable to the City until 1972, the court had an obligation to correct the present consequences of discriminatory conduct that occurred before that date. *Robinson v. Lorillard Corp.*, 444 F.2d 791, 795 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Local 189, Papermakers v. United States*, 416 F.2d 980, 987–88 (5th Cir. 1970), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1971); *Quarles v. Phillip Morris, Inc.*, 279 F.Supp. 505, 515–16 (E.D.Va.1968).

At least seven circuits, including our own, have held that a court may authorize the

27. We note that the district court's consideration of these issues is contingent upon the willingness of the parties to further litigate them.

28. The decree actually uses "and" rather than "or." However, the context makes it clear that the disjunctive form was intended.

29. In a postdecree order issued September 7, 1976, the district court suspended the hiring quotas to allow the City to appoint patrol officers from the roster of 1,091 candidates derived from new examinations given by the Department in 1975. The results of that examination, which the district court found not to have a discriminatory impact against racial minorities or women, had not been available when the court entered its final order. Although we are not considering appeals from the September 7 order as part of this case, we have ordered that it be made part of the record to ensure that appeals from the imposition of mandatory quotas contained in the final decree are not now moot. After considering the statements of the parties on this question, we hold that the propriety of the quotas is not a moot issue because they are still in force as to promotions and because they could be reinstated as to hiring at any time.

use of mandatory racial or sexual quotas in the exercise of its remedial powers under Title VII. *Southern Illinois Builders Association v. Ogilvie*, 471 F.2d 680 (7th Cir. 1973); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 273–74 (4th Cir. 1976); *Rios v. Steamfitters Local 638*, 501 F.2d 622, 628–31 (2d Cir. 1974); *United States v. N. L. Industries, Inc.*, 479 F.2d 354, 377 (8th Cir. 1973); *United States v. Ironworkers Local 86*, 443 F.2d 544, 552–3 (9th Cir. 1971); United States v. Local 38, IBEW, 428 F.2d 144, 149–51 (6th Cir. 1970); *Local 53, Heat Workers v. Vogler*, 407 F.2d 1047, 1053–54 (5th Cir. 1969). In addition, this court has held that such preferential relief violates neither the equal protection clause nor any provision of Title VII. *Crockett v. Green*, 534 F.2d 715, 718 (7th Cir. 1976); *Southern Illinois Builders*, 471 F.2d at 683–86.

■ Preferential numerical relief nevertheless remains an extraordinary remedy, and its use must be justified by the particular circumstances of each case. In this case the district court initially rejected numerical relief in its preliminary injunction order in the hope that a remedy could be fashioned by agreement of the parties. In its final order, however, the district court determined that numerical standards were necessary in view of the City's recalcitrance in voluntarily taking steps to correct the racial and sexual imbalances within the Police Department. In light of the frustrations which the district court has faced since the beginning of this litigation in attempting to construct a remedy that did not require mandatory quotas and its caution in

finally imposing them, we cannot say that its action was an abuse of discretion.[30]

■ The Burauer plaintiffs also challenge the quotas imposed by the district court because, they assert, the requirement that sixteen percent of new appointments to patrol officer positions be women is both arbitrary and too low in proportion to the number of female applicants. There is substance to this contention because the sixteen percent figure appears to be what was left after the district court allocated equal quotas of forty-two percent for both white and nonwhite males. Moreover, 25.9 percent of the applicants for the 1975 patrol officer's examination were female.

However, the district court itself noted these problems in an order issued on March 31, 1976 which is part of the record in this case. We therefore decline to interfere with the district court's discretion until it has had a chance to correct any underrepresentation of females that has become apparent since its final decree.[31]

## B. THE INDIVIDUAL CLAIMS OF THE ISAKSON DEFENDANTS

The Isakson defendants, representing candidates for patrol officer positions on the 1971 patrolman's roster, contend that the district court's final decree illegally deprived them of vested rights by permitting the City, at its option, to disregard the 1971 roster in making new appointments as long as the mandatory quotas were met.[32] We agree, and vacate this aspect of the decree.

As we have previously noted, the hiring procedure of the Chicago Police Depart-

---

**30.** Our conclusion that the district court only resorted to the use of mandatory quotas when no other solution was possible is buttressed by the September 7, 1976 order in which the hiring quotas were suspended because new testing procedures yielded nondiscriminatory results. *See* note 29, *supra*.

We also hold that the district court did not abuse its discretion in imposing promotion quotas for Hispanics even though they did as well as whites on the sergeant's examination. In view of the strong evidence of discrimination against Hispanics with respect to hiring and their underrepresentation in command positions, the court may well have determined that special protection was advisable during the pe-

riod of adjustment in the Department's employment practices.

**31.** Another reason for not granting specific relief to the Burauer plaintiffs at this time is that females are not underrepresented on the roster derived from the 1975 examination, which is the current source for new appointments to the Department. *See* note 29 *supra*.

**32.** The final order, at Part I, subpart 8(b), 411 F.Supp. at 249, laid out the numerical quotas which we have previously discussed and then went on to state: "So long as they comply with this requirement of this decree, the Chicago defendants are authorized to appoint, at their election, but in rank order, persons who remain

ment is governed by the Illinois Municipal Code. That statute unequivocally states that only persons who pass a qualifying examination may be placed on the eligibility roster for a position covered by the Code and that hiring for that position must be from the eligibility roster, in rank order. Ill.Rev.Stat. ch. 24, §§ 10–1–12, 10–1–14. Of course, insofar as these provisions, as applied, violate the command of Title VII, their operation must be suspended under the supremacy clause. Moreover, the City has an affirmative obligation to develop new tests, within the constraints of state law, that do not produce illegally discriminatory results. But the fact that the general testing procedure set up by the Illinois legislature, as put into practice by the City, produced results which conflicted with federal civil rights legislation did not give the district court an unbridled license to replace the state's method for selecting police officers with its own. "When a state statute is assailed because of alleged conflict with a federal law, the same considerations of forbearance, the same regard for the lawmaking power of States, should guide the judicial judgment as when this Court is asked to declare a statute unconstitutional outright." *Farmers Union v. WDAY, Inc.*, 360 U.S. 525, 546, 79 S.Ct. 1302, 1314, 3 L.Ed.2d 1407 (1959) (Frankfurter, J. dissenting). Accordingly, the district court should have constructed its remedy to preserve as much of the Illinois statutory scheme as possible.

■ It failed to do this when it allowed the City to depart from the 1971 and 1972 rosters in selecting new patrol officers. It was unnecessary to permit the City to discard the rosters entirely in compelling it to correct racial and sexual imbalances in the Police Department. The forty-two percent of the patrol officers who would be hired under the decree after the fifty-eight percent quotas for blacks, Hispanics, and women have been filled must be selected from the applicable eligibility rosters, in rank order.[33]

The Isakson defendants also ask us to hold that persons on the 1971 roster must be hired ahead of persons on the roster derived from new examinations given by the Chicago Civil Service Commission in 1975. We decline to rule on the precedence of the 1971 examination vis-à-vis subsequent examinations. The district court's final order, from which this appeal is taken, was issued before the results of the 1975 examination were available. It therefore would be inappropriate at this point for us to decide the difficult issues of state law that may arise in determining the rights of persons on the 1971 roster in light of the existence of the new roster derived from the 1975 examination.[34] We limit our holding in this case to the statement that the City must utilize the results of some examination given pursuant to Illinois law in appointing patrol officers.

## C. THE INDIVIDUAL CLAIMS OF THE ARADO DEFENDANTS

The Arado defendants, representing patrolmen on the 1973 sergeant's eligibility roster, challenge the portion of the final order that permitted the City to make permanent the temporary promotions to the rank of sergeant which had been effective

on the eligibility lists based upon the 1971 Patrolman's Examination and the 1972 Policewoman/Matron's Examination . . . ."

**33.** The decree, while not requiring nonquota patrol officers to be hired from the rosters, curiously does appear to require that blacks, Hispanics, and women within the fifty-eight percent mandated by the quotas come from the rosters. The decree states, at Part I, Subpart 8(b), 411 F.Supp. at 249, that the quotas shall be followed "subject to the availability of qualified black, Spanish-surnamed and female applicants." "Qualified" in this context seems to refer to candidates who have been listed on an

eligibility roster pursuant to Illinois law. While none of the parties is appealing this portion of the decree, we note our approval of this requirement.

**34.** We again note the existence of the district court's order of September 7, 1976, in which it ordered subsequent hiring to be from the roster derived from the 1975 examinations to the exclusion of persons on the 1971 roster. A separate appeal from that order has been taken to this court.

since June 1975. The Arado defendants contend that even if quotas are to be imposed, the district court erred in allowing the City to go outside the 1973 roster except to correct racial and sexual imbalances. For the reasons we stated with respect to the Isakson defendants, we agree, and vacate this portion of the final order.

Promotions within the Police Department, like appointments, are strictly governed by the Illinois Municipal Code. The Illinois legislature has limited promotions to any position covered by the Municipal Code to the top three candidates on the relevant eligibility roster. Ill.Rev.Stat. ch. 24, § 10–1–13. While the district court was required under Title VII to suspend this statutory scheme to remedy illegal discrimination, it should not have authorized actions contrary to the Municipal Code which were not necessary to achieve this goal. The temporary appointments to sergeant were made completely at the discretion of the Police Department. The Code appears to have been designed exactly to prevent this exigency. Therefore, we hold that those appointments cannot be made permanent. Promotions to sergeant after the forty percent quota has been filled [35] must be made from a roster derived pursuant to state law.

## D. THE INJUNCTION AGAINST PAYMENT OF REVENUE SHARING FUNDS

 The City defendants finally contend that the district court exceeded its authority in continuing to enjoin the federal government from paying the City $76,-000,000 [36] in revenue sharing funds under the State and Local Fiscal Assistance Act of 1972. We hold that the district court's action, based on the Act's nondiscrimination provision, was both in tune with the intent of Congress in enacting the statute and a proper exercise of equitable discretion in compelling the City to find a method of hiring and promoting police officers, consistent with state law, that did not discriminate against racial minorities and women.[37]

Section 122(a) of the Fiscal Assistance Act, 31 U.S.C. § 1242(a), states:

> No person in the United States shall on the grounds of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under [the Act].

The district court concluded that the City had violated this provision, based on the court's prior finding of employment discrimination in violation of Title VII and on the admitted use of federal revenue sharing funds to pay police salaries. The validity of the district court's conclusion is buttressed by the regulations issued by the Secretary of the Treasury under section 142(a) of the Fiscal Assistance Act, 31 U.S.C. § 1262(a), which state in pertinent part:

> In any program or activity funded in whole or in part with entitlement funds,

---

**35.** Fulfillment of the forty percent promotion quota, as in the case of the hiring quota, is subject to the availability of "qualified" black and Hispanic applicants. Again, this language presumably directs the Police Department to select black and Hispanic patrol officers to fill the quota from the applicable eligibility list—in this case, the 1973 roster.

**36.** The amount withheld appears to be at least this much. The district court noted that $95,-000,000 might be a more accurate figure while the City claimed that over $114,000,000 has been withheld.

**37.** Congress has recently passed, and the President has signed, a bill adding amendments to the Fiscal Assistance Act that specifically grant federal courts the power to withhold funds for violations of the Act's nondiscrimination provision. See State and Local Fiscal Assistance Amendments of 1976 § 8, Pub.L.No. 94–488, 90 Stat. 2341. These amendments, which do not take effect until January 1, 1977, have been made part of the record in this case. The Robinson plaintiffs have urged that the amendments clarify the original intent of Congress to permit the district courts to withhold funds. The City replies that the fact that Congress amended the Act to add this power indicates that it did not previously exist. We will not resolve this probably unanswerable question because in determining that the district courts presently have the power to withhold funds we do not rely in any way on the passage of the amendments.

a recipient government may not . . subject any individual to discrimination on the ground of race, color, national origin, or sex in its employment practices. 31 C.F.R. § 51.53(a).

Moreover, these regulations state that the standards to be used in determining whether employment discrimination exists for purposes of the Fiscal Assistance Act are ordinarily the same as the standards used by the EEOC under Title VII. 31 C.F.R. § 51.53(b). Since regulations promulgated pursuant to rulemaking authority granted by statute have the force of law, *see, e. g., Federal Crop Ins. Co. v. Merrill*, 332 U.S. 380, 384-85, 68 S.Ct. 1, 92 L.Ed. 10 (1947), we hold that the district court was correct in finding that the Department's hiring and promotional practices violated the Fiscal Assistance Act as well as Title VII.

Therefore, the only issues remaining on appeal are whether the district court had the power to order the withholding of the federal revenue sharing funds which are distributed under the Fiscal Assistance Act because the Act's nondiscrimination provision had been violated and whether, even if the court had the power, its action was a proper exercise of discretion. The question of power can be resolved by examining the structure of the Act, as illuminated by the administrative regulations promulgated under it.

The Act provides alternative procedures for enforcement of section 122. First, the Secretary of the Treasury must seek voluntary compliance by asking the governor of the state where the violation is occurring to correct it. 31 U.S.C. § 1242(b). The Secretary took this required step in April 1974. *See* 395 F.Supp. at 334.

If the governor fails or refuses to secure compliance, the Secretary may either refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted, initiate administrative proceedings,[38] or take any other actions provided for by law. 31 U.S.C. § 1242(b). In this case the Secretary pursued the first option, and the Attorney General followed the Secretary's recommendation by amending the Government's complaint to allege violation of the Fiscal Assistance Act. Under section 122(c) of the statute, the Attorney General may request "such relief as may be appropriate, including injunctive relief." 31 U.S.C. § 1242(c).

In view of this statutory scheme, the power of the district court to withhold revenue sharing funds is apparent. The phrase "injunctive relief" in section 122(c) can have only two possible applications: to the discriminatory conduct itself and to the payment of revenue sharing funds. It would be anomalous to construe "injunctive relief" to allow a court to directly interfere with the activities of state or local governments but not to permit the less drastic step of enjoining the payment of federal funds in an effort to force the noncomplying government to itself choose a means of ending illegal discrimination. The former involves a greater abridgement of state or local autonomy by a federal court than the latter, and therefore the latter is to be preferred on federalism grounds.

▪ Moreover, to deny the district court the power to withhold revenue sharing funds would seriously cripple it in its efforts to enforce the nondiscrimination provision and would be contrary to the established policy of permitting a court to use the full range of its discretion in fashioning equitable remedies. "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). *See also Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). A court is not limited to simply prohibiting action in violation of a statute, but may also

---

**38.** The administrative proceedings are provided for in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

require affirmative acts to be taken to assure compliance. *See, e. g., Green v. Connally*, 330 F.Supp. 1150, 1177–78 (D.C.D.C.) (three-judge court), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).

Finally, the regulations promulgated by the Secretary governing enforcement of the nondiscrimination provision specifically authorize a district court to withhold revenue sharing funds in a civil action brought by the Attorney General.[39] In light of the deference which we must give to the interpretation of a statute by the agency assigned that task by Congress, as well as the other factors we have enumerated, we hold that the district court had the power to withhold revenue sharing funds in order to secure compliance with the Fiscal Assistance Act's nondiscrimination provision.

The City advances two arguments to support its contention that the district court lacked the power to withhold revenue sharing funds. First, it asserts that funds may not be withheld unless the state or local government in question is out of compliance with a court order, and that it has fully complied with all the affirmative requirements of the district court's preliminary injunction and final order. As a matter of law, it is dubious whether a district court's power to withhold funds is contingent upon the defendant's disobedience of the court's own injunction or order.[40] In addition, however, the City's statement that it has fully complied with the district court's injunction and final order is at odds with the district court's finding that "the City defendants have done virtually nothing to alleviate the effects of their discrimination" since the issuance of the preliminary injunction, contrary to the mandate of that injunction and the Fiscal Assistance Act. *See* 411 F.Supp. at 244. The key to complying with the preliminary injunction and ending discrimination within the Police Department was the development of new tests that would produce nondiscriminatory results. At the time the district court entered its final order, the City had not yet demonstrated that it was willing to construct nondiscriminatory examinations, and the withholding of revenue sharing funds during the interval between the issuance of the preliminary injunction and the entry of the final order was properly perceived by the district court as a necessary tool in prodding the City toward ending discrimination.

Furthermore, the district court retained the power to continue the withholding of funds after it had issued its final order. Given the recalcitrance of the City in devising its own remedy, the court could logically require that portions of the funds be paid

---

**39.** 31 C.F.R. § 51.59(d) states in pertinent part: Nothing in these regulations is intended to preclude the United States, in a civil action initiated by the Attorney General of the United States pursuant to section 122(c) of the Act, from seeking, or a court from granting, an order to require the repayment of funds previously paid under the Act, or an order that the payment of funds under the Act be terminated or withheld.

**40.** The City relies on *Adams v. Richardson,* 351 F.Supp. 636 (D.C.D.C.), *aff'd in part,* 156 U.S. App.D.C. 267, 480 F.2d 1159 (1971) *(en banc),* and *Lee v. Macon County Board of Education,* 270 F.Supp. 859 (M.D.Ala.) (three-judge court) *(per curiam), aff'd sub nom. Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967), as authority for this proposition. Both of those cases, however, dealt with the authority of the Secretary of Health, Education and Welfare to withhold federal funds in the face of a federal court order. The courts in *Adams* and *Lee* refused to allow executive branch officials to interfere with the equitable discretion of federal courts in choosing particular remedies to end discrimination. There are regulations promulgated under the Fiscal Assistance Act permitting the Secretary of the Treasury to withhold revenue sharing funds on his own authority pending action by a court; following the logic of these cases they require that the court has not yet resolved the question of withholding. 31 C.F.R. § 51.59(c). But the power of the court itself to withhold funds when a state or local government is subject to a court order enjoining discrimination—particularly as in this case when the court that seeks to withhold the funds is the same court that issued the injunction—presents far different considerations. The danger of interference with the discretion of the district court entering the substantive order designed to end discrimination is much less.

out only after the City had taken steps to comply with the order.

The City's second argument is that the district court lacked the power to withhold funds absent a constitutional violation. But as we have already noted, discriminatory conduct which violates Title VII is enough, without proof of a constitutional infirmity, to establish a violation of the Fiscal Assistance Act's nondiscrimination provision. It would be anomalous to not permit the district court to enforce that provision, which is itself statutory, simply because the City has not violated the Constitution as well as Title VII.

■ The City also asserts that even if the district court had the power to withhold funds, it abused its discretion in doing so in this case. We disagree. The district court has demonstrated unusual patience with the defendants throughout the course of this litigation. We have already alluded to the City's failure to take affirmative steps to end discrimination in the Police Department following the preliminary injunction in 1974. In addition, the City's unilateral suspension of the interim hiring agreement and its failure to promptly eliminate purposeful sexual discrimination in the Department after entry of the preliminary injunction lend support to the district court's decision both initially to withhold revenue sharing funds and to continue to withhold them until compliance with its order is assured.

The City further urges that the district court should only have withheld that portion of the funds allocated to the Police Department, rather than the entire sum earmarked for the City of Chicago, because any discrimination occurred solely within the Department. The City relies on *Gautreaux v. Romney*, 457 F.2d 124 (7th Cir. 1972), where this court held that a district court could not enjoin the payment of federal funds to Chicago's Model Cities Program because of discrimination in federally financed activities of the Chicago Housing Authority.

The key to the *Gautreaux* decision was that an insufficient nexus existed between the failure of the Chicago City Council to approve public housing sites in predominantly white areas and payments by the Department of Housing and Urban Development to the Chicago Model Cities program, which was untainted by discrimination. This case presents different facts. In contrast to the situation in *Gautreaux*, all of the funds withheld by the district court were to be paid to one set of local officials pursuant to one statute. Also, between 1972 and 1974, when payments were suspended, 97.7 percent of the revenue sharing funds paid to the City were allocated to public safety, with 75 percent of those funds going directly to the Police Department. Thus, the relationship between the funds withheld and the discriminatory conduct at issue was considerably closer in this case than in *Gautreaux*. Moreover, there was evidence that if the district court withheld only part of the funds the City might change the allocation of funds to the Police Department in order to avoid the effects of the district court's order. *See* 395 F.Supp. at 344. Accordingly, we hold that the district court did not abuse its discretion in withholding all of the funds earmarked for the City of Chicago under the Fiscal Assistance Act.

The judgment of the district court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

PELL, Circuit Judge, dissenting.

Being of the conviction that some one hundred millions of dollars of federal revenue sharing funds were improperly and needlessly withheld from the City of Chicago and that what should have been stayed was the equitable hand of the district court rather than the flow of essential operating funds to one of the largest metropolises of this country, I respectfully dissent from that portion of the majority opinion dealing with the withholding[1] of the revenue sharing funds.[2]

---

1. Although the funds were escrowed, the district court refused to place the withheld funds in an interest-bearing account.

2. Other than with regard to the withholding issue, I am in general agreement with the result reached in the majority opinion. Although ba-

We need not take judicial knowledge of the financial plight of large cities, that is a matter of common knowledge; yet when a reading of the necessarily extended opinion written by Judge Swygert is completed we find that only one paragraph has been devoted to whether the withholding of this substantial sum constituted such an abuse of equitable discretion as to require reversal. Irrespective of whether the district court had the power it exercised with regard to these funds, and I generally entertain the idea that a federal court acting in equity inherently must and does possess the power to fashion a remedy appropriate to the accomplishment of proper ends,[3] it appears to me from a review of the reported proceedings[4] that the district court, assuming for the sake of the argument that it possessed the power it exercised, prematurely and improvidently exercised it.

The reported cases referred to above as well as the majority opinion set forth in considerable detail the events and happenings in this protracted litigation which has occupied an inordinate amount of time of the district court and a substantial amount of time of this court in its several trips here. Nevertheless, it appears advisable to me to set forth the salient factors which appear to me to have culminated in the improper action of withholding.

On April 24, 1974, the district court consolidated various cases charging discrimination in police department practices.[5] More than two months prior to that date, following unsuccessful efforts in administrative proceedings to cut off the flow of revenue sharing funds to Chicago (the City) certain of the individual plaintiffs filed a civil suit in the district court of the District of Columbia (D.C.) to achieve the same objective. The City *was not* made a party although it was aware of the litigation. The D.C. litigation had not been met with success as of November 7, 1974, at which time Judge Marshall entered a preliminary injunction in the Northern District of Illinois.[6] The Marshall injunction in no way was concerned with the matter of the disbursement of revenue sharing funds. Although the D.C. plaintiffs were also plaintiffs in the Northern District of Illinois, where the City was a party, the efforts at stopping the money to the City were at that time confined to the D.C. litigation.

The Marshall preliminary injunction that was granted, putting it very simply, prohibited further hiring of patrol officers and the advancement of officers to the rank of sergeant discriminatorily toward females and black and Spanish surnamed males. The district court recognized that because of the pending action the City had refrained from hiring patrol officers and from promoting officers to the sergeant rank, and that "[e]ventually, the shortage of patrol officers will become critical in a city the size and complexity of Chicago."[7] The court nevertheless was of the opinion that the injunctive relief "would be required as the *only effective remedy* pending development by defendants of valid testing

sically confining my dissent to the matter of the withheld revenue sharing funds, I will, after discussing that issue, set forth a few observations which I believe to be appropriate to other matters raised by the present litigation.

3. In an equity case, the nature of the violation determines the scope of the remedy. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This would not appear to me to be the basis for justifying a remedy where there has been no violation or justifying a remedy substantially broader than that called for by the violation.

4. *United States v. City of Chicago,* 385 F.Supp. 540 (1974); 385 F.Supp. 543 (1974); 395 F.Supp. 329 (1975); 411 F.Supp. 218 (1976); 416 F.Supp. 788 (1976); 420 F.Supp. 733 (1976). (All in the Northern District of Illinois, and all references in this dissent, unless otherwise noted, to "district court" will be to that court.)

5. 385 F.Supp. 540.

6. 385 F.Supp. 543.

7. *Id.* at 547.

procedures." [8] (Emphasis added.) Nowhere do I find in the record of this case any persuasive reason for thinking that if this injunction had been enforced by normal and traditional means available to equity courts the desired objective of elimination of discrimination could not have been achieved without resorting to the extraordinary procedure of stopping operating funds, the lifeblood of a complex metropolis, which city in this case ultimately had to turn to commercial banks for loans with which to meet the crisis when the federal funds were in fact stopped.

Further, it is quite clear that the City had no intention to violate the crisp and explicit terms of the preliminary injunction. Indeed in the month following its entry, the parties had reached an agreement which the court approved on December 16, 1974, for the hiring of police officers according to a specified schedule. The purpose of the agreement was to alleviate a critical shortage of police officers attributable in part at least to the preliminary injunction.[9] It is patent, of course, that those plaintiffs concerned with non-discriminatory hiring of police officers were in agreement that the scheduled hirings were not discriminatorily tainted. Equally obviously the agreed order did not purport to correct any existent disproportionment, for the preliminary injunction was keyed only to future hiring and did not mandate discharge of existing police officers to achieve a balance in the existing force. Indeed, the preliminary injunction itself did not require any one to be hired; it merely, as stated, enjoined discrimination when hiring did occur.

As of December 16, 1974, the defendants had every reason for thinking that everyone was well on the way to an amicable solution to formidable problems. The hiring practices of the City based upon examinations which had been thought of as achieving job-related results had been found wanting by a federal judge who had determined that the resulting disproportionate impact required judicial correction in future hiring practices. Following negotiation by the litigants steps were outlined for going forward with interim hiring, and in the meantime work was underway for devising new examinations which might happily achieve both job-relatedness and a racially and sexually proportionate situation.

The rosiness vanished from the picture two days later, December 18, 1974, when Judge John Lewis Smith, Jr., in the D.C. district court entered an injunction enjoining the Office of Revenue Sharing officials from making further payments of federal revenue sharing funds to the City until further order of the court and in no event until the entry of a final order in the Northern Illinois litigation with the defendants in that litigation (they were still not parties in the D.C. litigation) giving formal assurances of compliance and continuing to monitor compliance thereafter. Inasmuch as Judge Smith's injunction was based upon the November 7 decision of Judge Marshall, we must turn to that to attempt to discern why the D.C. judge thought it necessary to impose what I regard as an extraordinarily punitive sanction. There could have been nothing before Judge Smith to show lack of compliance or lack of intent to comply with the November injunction; nor was there any basis for thinking that the final order of injunction, if one were entered, would be any broader than the November preliminary injunction. Indeed, the final injunction was narrower in scope.[10]

When we turn to the November findings of Judge Marshall upon which the withholding injunction of Judge Smith was based, we must note that the judge who made

---

8. *Id.* at 548.

9. 395 F.Supp. at 336.

10. The district court had preliminarily enjoined the use of departmental efficiency ratings based on a finding that they were racially discriminatory. In its final decree the court reversed itself and found that such efficiency ratings were not discriminatory. The same is true for assignments within the department which the court found to be nondiscriminatory. The court also rejected claims that a 1970 lieutenant's examination was invalid under Title VII.

those findings regarded them only as establishing "a *prima facie* case of *de facto* discrimination in employment and promotion."[11] (Italics in the original.) The prima facie case was established by the resultant imbalance which followed the past hiring and promotion practices and did not rest upon any determination of an intentional and invidious determination to discriminate. This imbalance, however, was deemed sufficient to warrant a preliminary injunction. The infirm basis that the findings and preliminary injunction of November constituted for Judge Smith's order is clearly demonstrated by the following characterization by Judge Frank in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953):

> The judge's legal conclusions, like his fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation. For a preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.

Further, it is to be noted that Judge Marshall rested the granting of the preliminary injunction on the double prongs of constitutional and statutory deficiency. But as we now know from the subsequently decided *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), official acts are not unconstitutional solely because they have a racially disproportionate impact.

Eventually, after some unsuccessful efforts to remove the ban on receipt of the revenue sharing funds by way of collateral attack in the Illinois district court and this court, the City hied to Washington, as with hindsight it should have in the first place, and, after unsuccessfully attempting to secure direct relief there, did secure the transfer of the D.C. proceedings to the Northern District of Illinois whereby they became a part of the ongoing litigation before Judge Marshall. It might appear that the story was now ready for a happy ending but in the meantime the City's expeditious negotiation following the November injunction provided the stumbling block rather than the paving stone to early solution of problems. Under the December agreed order, which, it must be understood was not an order emanating from Judge Marshall to which he secured agreement but was instead one upon which the parties had agreed and which the judge then approved, the first group of applicants were to report for training on January 6, 1975. On January 2, 1975, the Acting Superintendent of Police issued the following notice:

> It now appears unlikely that the federal revenue sharing funds due on Monday, January 6, 1975, will be received by the City on that date. Inasmuch as a substantial portion of these funds was to be used for the payment of police salaries, the Comptroller has suggested, and I have directed, that the proposed hiring of 200 police candidates on Monday, January 6, 1975, be deferred until this matter is resolved in the pending litigation in the federal court. I have also directed that the 200 candidates scheduled to report for training on Monday, January 6, 1975, be immediately notified of this unfortunate, but necessary decision.

The novelist who charts his plot line so as to embroil his characters in confrontations finds timing a necessary instrument. As in the case of the contrived plot, if something had happened earlier or later, how different the results would have been! Here if the withholding injunction had come down before the negotiations had reached agreement, it is entirely reasonable to think that the City would have first addressed itself to getting its operating funds restored. I

---

11. 385 F.Supp. at 552.

have no reason for thinking that the City would not have been successful before Judge Marshall, who was aware at the time that the City was progressing toward the development of a new patrol officers' examination which hopefully would meet the requirements of law,[12] and who had recently expressed the opinion that "[i]t is far better in cases of this nature that the remedy come from the parties rather than the court."[13] There simply would have been insufficient motivation before the court to require the continuance of the crippling suspension of revenue sharing fund payments. Conversely, if the order by Judge Smith had been delayed until after the agreed order plan had been implemented, Judge Marshall when asked to reconsider Judge Smith's injunction when it was properly before him would have been able to do so in the light of the fact that the City was not only obeying the purely negative aspects of his November injunction by not hiring or promoting but was also affirmatively going forward with a negotiated plan for elimination of the disproportionate aspects resulting from practices found by him to be deficient statutorily and constitutionally.

The timing, however, was not right and early January of 1975 found one of the largest municipalities in the nation facing the immediate loss of nearly 20 million dollars which had been budgeted by it and which the paying Government had thus far intended to pay, not doing so solely because of a court injunction. The prospect was that a like amount would be stopped each quarter thereafter unless the injunction could be lifted. Quite understandably, the City finding uncertainty introduced as to the matter of payment of those already on the payroll abandoned its planned departmental increases and turned its attention to getting itself back on the federal payroll. The same period of time found a federal judge, who had regarded the agreed order as permissive although the parties had cast it in mandatory language,[14] now incensed at the ex parte failure to comply with that order, which refusal the district court later characterized as "the arrogant, contumacious refusal by the City defendants to honor their interim hiring agreement and our order approving it of December 16, 1974."[15] The confrontation and its resultant deleterious effect on the working out of the societal problems inherent in this litigation were inevitable as was the snowballing crystallization of antagonistic attitudes between these two branches of government. Early in the period of confrontation it might have seemed that the simple judicial answer would have been that jurisdiction of the withholding injunction now being in Illinois, the withholding injunction would be vacated until further order of the court provided that there was prompt compliance with the December agreed order. This would seem to have been the position of the federal government which on January 20, 1975, responded, consistently with the position it had taken when the action was pending in the District of Columbia, that the withholding order should be modified as requested by the City. The Government added, however, that in view of the City's refusal to implement the interim hiring agreement and to give assurances that it would comply with the court's order of November 7, 1974, *further* revenue sharing payments should not be made to the City. Although the Government thereby was retreating from its earlier position that the flow of the funds should not be stopped, nevertheless the fact is patent that the appropriate authorities of the Government having to do with the payment of these funds were willing to have the payment released that should have been paid on January 6, 1975. Further, while the City had perhaps not given formal assurances that it would comply with the November order, there had been no failure to comply nor any indication that there would be such a failure. The only real factor in the Government's new position on future payments

12. 385 F.Supp. at 548.

13. *Id.* at 561.

14. 395 F.Supp. at 346.

15. 411 F.Supp. at 224.

was the failure of the City to proceed with the interim hiring notwithstanding the cut-off of revenue sharing funds. Indeed, as late as January 5, 1976, the court stated that the Office of Revenue Sharing defendants had been ambiguous and faltering on the matter of withholding and that "it is not clear that they would continue to withhold those payments should the injunction be dissolved."[16] The court also at that time observed that the Department of Justice had taken an ambiguous stance.[17]

Also, when early in 1975, the district court had before it the matter of modifying or vacating the D.C. injunction, it could have resorted to traditional methods of enforcement of injunctions, as it was urged to do by the plaintiffs as to the mandatorily worded interim hiring agreed order. Although expressing regret subsequently that it had not done so,[18] the court took what appeared to it at the time to be the wiser course[19] and neither compelled compliance by traditional methods with the interim hiring order nor ruled on the City's motion to modify the D.C. injunction. Instead the court deferred these matters until the trial was underway, and they were not the subject of formal judicial action until the memorandum decision of April 21, 1975. In the meantime positions had solidified, and the resultant aggravations increased the difficulties of negotiated solutions which had seemed so happily on the way prior to the granting of the D.C. injunction. Reality, of course, requires recognition of the fact of litigation life that, while parties have relatively great freedom in negotiating with each other toward an agreement, a judge who believes, rightly or wrongly, that his order has been willfully violated is less amenable to a bargaining process to secure compliance.

Another fact which appears inescapable to me is that at the time these early 1975 motions were before the court, the course which appeared wiser to the court was also probably the easier way. A last resort remedy, which I consider the withholding of revenue sharing funds to be, implicitly is the one that is most likely to be drastic in its effect. Certainly the withholding of millions of dollars from financially plagued megapolitan cities is a device designed to bring them quickly to their knees. It is because of the stringency of this remedy that I regret the majority opinion of this court did not come down hard on the proposition that such withholding while a potential remedy is a last resort one by holding that in this case the last resort stage had not been by any means reached. A trial judge confronted with the problems of the type here involved should not be permitted to yield to the song of the siren.

In addressing the issue of whether the withholding injunction should be vacated,[20] the district court, after reciting the background, dealt with and denied various legal arguments advanced by the City. Irrespective of whether I am able to agree with the district court's disposition of these, I shall not lengthen this dissent by treating them because my principal concern is with what I regard to be the larger issue of the misuse of equitable power. The district court disposed of the equitable discretion issue in seven paragraphs[21] with principal reliance being placed upon the City's unilateral suspension of the hiring which was to have taken place under the December 16 agreed order. The court found inescapable the conclusion that the City cancelled the interim hiring program, found by the court to involve $350,000 for the first quarter of 1975, in an attempt to lever loose $19,000,000 in revenue sharing funds. Indubitably the City did abandon further hiring despite its needs for replacement patrol officers; however, the court's reasoning ignores the facts that the sum of $350,000 was just the first quarter cost estimate and would be a

---

16. 411 F.Supp. at 245.

17. *Id.* at 246.

18. *Id.* at 224.

19. 395 F.Supp. at 338.

20. 395 F.Supp. at 339 *et seq.*

21. *Id.* at 344–45.

continuing cost item in the future. At this point because of the inaction of the court, the prospect of a change in the receipt of revenue sharing funds was a bleak one. Further, while $350,000 may have appeared on the petty side to the court when compared with $19,000,000, the City was now facing the fact that without the larger sum it would still have to meet the budgeted payroll of the existing police force. A third of a million dollars it would reasonably seem would constitute the aphoristic straw.

The district court also in considering the equitable discretion issue referred to the fact that the promised new patrol officer examination had not been forthcoming. Over and above the fact that the incentive to forge ahead with the development of this plan had been seriously diluted when it was becoming evident that the City was going to have difficulty in securing a substantial portion of the sum needed to pay the patrol officers already on the payroll, the fact appears obvious to me from an examination of the massive record in this cause that the matter of an a priori determination that a plan for the hiring of police officers would achieve those best qualified to serve in that capacity is an extremely difficult task. A federal district judge who is faced with the awesome task of saying that methods of selection are truly job-related or not job-related is deserving of great sympathy. Certainly Judge Marshall in the instant case can be said to have given every ounce of devoted attention to the best possible resolution of the thorny questions involved. Nevertheless, from the point of view of the devisers of the plan who had to produce methods which at once would achieve job-relatedness and would not be violative of Title VII, the problems were also awesome. From my own observation of this record, I could entertain real doubts as to whether the matter of an equation between performance on examinations and performance in the field would be susceptible of advance determination but would necessarily be de-

pendent upon an examination of the actual performance. Even this post hoc approach would not seem productive of scientific certitude as at least some of the evaluation of actual performance would be based upon human subjective considerations.

The majority opinion of this court obviously does not agree with my evaluation of the stringency of the withholding remedy and states that the direct interference with activities of local government is more drastic than the withholding of federal funds. While the district court here engaged in both the direct and indirect forms of interference, I cannot agree with the majority premise that the withholding lacks stringency of the greatest magnitude. Stopping the flow of lifeblood to a body is certainly more fatal than enjoining that body from certain activity. In the context of the states' power to tax, a great Chief Justice long ago observed that the power to tax involves the power to destroy.[22] It appears to me that the power to withhold operational funds from a municipality has an equally destructive potential. As the district court itself observed, the philosophy of the Fiscal Assistance to State and Local Government Act, 31 U.S.C. § 1221, "is to return to state and local government a portion of the individual federal income taxes *paid by the inhabitants of the territory governed by the state and local government.*" (Emphasis added.)[23] Implicit in the recognition that upon ultimate analysis the City was just getting its inhabitants' tax money back for its own uses was the court's further observation that "[t]he funds are payable to the state and local governments almost as a matter of right on a quarterly basis."[24]

Illumination upon the stringency of the withholding of federal funds is found in an analogous situation in the remarks of Senator Hubert Humphrey, the Senate Manager of the 1964 Civil Rights Act:

> The objective of title VI is, and should be, to end discrimination, and not to cut off Federal funds. In its present form,

---

**22.** *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 159, 210, 4 L.Ed. 579 (1819).

**23.** 411 F.Supp. at 244.

**24.** *Id.*

title VI is drafted on the theory that cutoff of funds should be avoided if racial discrimination can be ended by other means. It encourages Federal departments and agencies to be resourceful in finding ways of ending discrimination voluntarily without forcing a termination of funds needed for education, public health, social welfare, disaster relief, and other urgent programs. Cutoff of funds needed for such purposes should be the last step, not the first, in an effective program to end racial discrimination. Title VI would require that funds be refused or terminated if other methods of ending discrimination are not available, or have not proved effective. But it would allow Federal departments and agencies to try such other methods first.

Mandatory, immediate cutoffs of Federal funds would defeat important objectives of Federal legislation, without commensurate gains in eliminating racial discrimination or segregation. [110 Cong. Rec., p. 6546.]

Termination of assistance, however, is not the objective of the title—I underscore this point—it is the last resort, to be used only if all else fails to achieve the real objective, the elimination of discrimination in the use and receipt of Federal funds. This fact deserves the greatest possible emphasis: Cutoff of Federal funds is seen as a last resort, when all voluntary means have failed. [*Id.* at 6544.]

This attitude toward the stringency of. the remedy was also reflected in the present litigation by the response of the federal defendants to plaintiffs' renewed motion for summary judgment:

The withholding of revenue sharing payments to a recipient government can have the result of *initiated* programs being terminated, taxes being increased, employees being laid off, services being denied and other adverse effects. The fact that these funds will eventually be released some time in the future certainly does not mitigate the present fiscal plight

which they would be experiencing. . . .

It is also of some significance that in the district court the position of the City in seeking vacation or modification of the withholding order was supported by *amici curiae* briefs filed by the following responsible civic organizations: the Chicago Bar Association, the Chicago Crime Commission, the Civic Federation, and the Southeast Chicago Commission. These organizations which recorded their long standing stance against sexual and racial discrimination asserted that the economic sanction of revenue sharing termination was inappropriate in the circumstances of this case. The district court apparently found little significance in their support of the City because of their lack of familiarity with the record of this case.[25] Nevertheless, at the very least their support is indicative of the stringency of the economic weapon then being used by the court.

The majority opinion finds a preference for withholding funds as an enforcement means on federalism grounds. The stringency of the remedy, however, appears to me to be inconsistent with the trend of recent controlling decisions in the federalism area. See the discussion in § 52A, "Our Federalism," of Professor Charles Alan Wright's Law of Federal Courts, 3rd ed., 1976 at 229 *et seq.*, tracing the developments initiated by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), through *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). We also should not be unmindful that the Congress at one time provided for procedures, now happily substantially eliminated from federal jurisprudence, whereby interference with fundamental state procedures required the convening of a three-judge district court because of the likelihood of public resentment at such action occurring as the result of the action of a single judge. *See* Wright, *supra* at 213.

While I would entertain serious doubts about the power of the district court at the

---

**25.** 411 F.Supp. at 228–29.

pertinent time to enjoin the payment of the federal funds in the absence of a showing that there had been noncompliance with an injunction against discriminatory action, a situation which was certainly true at the time Judge Smith entered the original withholding injunction, in the light of cases such as *Adams* and *Lee*, cited in note 40 of the majority opinion, I have, as previously indicated not thought it necessary to pursue this aspect of the case in view of what I regard as the serious misuse of the power to the extent to which it may have existed.[26]

Unfortunately in the realm of human relations and the solution of problems arising therefrom there is no such thing as instant replay. The crystallization of attitudes and aggravations, real or believed to be real, all too often nullify the possibility of retracing steps toward an amicable and desirable solution. Here I am convinced that the withholding of needed revenue funds came about not because of any necessity but through a set of unfortunate circumstances which improperly delayed the result which the district court was so assiduously seeking.

As a culmination of the developments which have been set forth—the antagonisms, the cross-purposes, and, indeed, the loss of perspective—inevitably the order of February 2, 1976, under review here, perpetuated this unfortunate comedy of errors. I would therefore reverse the order enjoining the payment of the revenue sharing funds and order all such funds not heretofore released paid forthwith to the City.

As previously indicated in this dissent, I am in general agreement with the result reached otherwise in the majority opinion. I nevertheless find it necessary to remark upon certain phases of the issues presented to this court in the present appeal.

1. *Mandatory Quotas.* Despite the fact that several courts have found resort to the imposition of mandatory quotas to be the only practicable solution to the problems presented by either racial or sexual discrimination, it appears to me that this resort should only occur when the circumstances are of an *in extremis* nature. I regard this to be particularly true when the matter is the composition of a police department. In today's climate of increasing crime, with accompanying increase of public indignation and fear, the only standard for police department composition at every echelon should be, in my opinion, the very best possible person obtainable for the work to be performed. If meeting this standard means that the makeup of the department is disproportionately high with minority groups in relation to their position in the population picture, this would be more desirable than their being limited by the artificial limitation which is implicit when a quota has been imposed. It is for that reason no doubt that minority groups themselves do not consistently favor a quota system. It would appear fortunate that in later proceedings in the district court in the present litigation, which proceedings are not now before this court for review, the district court is amenable to deviating from strict adherence to the quota system in accordance with its own expressed distaste for that system.

2. *The Isakson Defendants.* The majority opinion at one point in relation to these defendants indicates that the 42 percent of the patrol officers "must be selected from the applicable eligibility rosters, in rank order." Insofar as this is stating, which it appears to be doing, that the 42 percent should have been hired from the 1971 patrolman's roster, it would seem to me to be inconsistent with the result thereafter reached in the opinion that it would be inappropriate for this court to decide the difficult questions of state law that might arise in determining the rights of persons on the 1971 roster in the light of the existence of the new 1975 examination roster. I think the court would have been better advised simply to leave the matter of deter-

---

**26.** Further, the situation as to the existence of the power in the future may have changed in view of the State and Local Fiscal Assistance Amendments of 1976. I would, however, not be able to agree with the plaintiffs' contention that the amendments are merely additional authority as to the existence all along of the power.

mination of the applicable state law to the district court, which is the ultimate holding on the Isakson issue.

3. *The Background Investigation.* The majority opinion recognizes "that careful screening through investigation of an applicant's background can be a useful device in determining whether an applicant has the personal qualities required of a police officer." I regard it as more than a useful device; rather it appears to me to be an essential instrument for the purpose. As the district court observed, "*Of course*, the Department *must* protect itself from those who would undermine it or work at cross purposes with it." (Emphasis added.) [27] What the district court did not add but is obvious is that the Department must protect itself not for its own self-preservation as an institution but because it is in the public interest that the police duties be performed effectively.

I cannot quarrel with the position of the district court affirmed by this court that there be articulable standards for guidance of those conducting the background investigations. Broadly stated criteria too easily lend themselves to subjective whim. Nevertheless, I am concerned with an implicit suggestion in both the writing of the district court and the majority opinion which might be construed as minimizing the importance of good character on the part of police officers. Perhaps the supervisor of the Recruit Processing Section was unable to put into words what "dissolute habits" meant,[28] but I have little doubt that if one's neighbors thought a person had dissolute habits, he would have little respect from them as a police officer without which respect he could not capably perform his duties. To paraphrase a famous reference in another field of law, the neighbors also might not be able to define in words "bad character, dissolute habits, and immoral character," but most of them would be able to recognize the existence of these attributes in those with whom they are acquainted.

It perhaps is too much to expect that every police officer will be an exact duplicate of Caesar's wife, but the nearer that goal is approached the more effective the police department will be. Frequent arrests or poor regard for financial obligations may be explicable and be shown not to detract from the ability to be an effective police officer. On the other hand, either or both may be demonstrative of an underlying disrespect for the law, a deficiency which should not exist in a person holding this position. It should also be remembered that in the city scene with the overload on the prosecutorial staffs and the courts and the reluctance of witnesses to become involved, many arrests which do not result in convictions nevertheless are arrests of guilty persons. The police department, in my opinion, is a questionable forum for rehabilitation. The job of articulating objective standards in the present area is certainly a tremendously difficult one. I merely express the hope that when the difficult task is completed the reviewing courts will permit the inclusion of aspects therein on a realistic basis consonant with the achievement of as high as possible regard on the part of the public toward those performing the duties of police officers.

4. *The Constitutional Sex Discrimination Issue.* The majority opinion correctly observes that the district court, by equating the equal protection clause with Title VII, failed to deal with the difficult problems which arise when a claim is made that a sex-based classification violates the equal protection clause. It directs the district court to face on remand the question of whether the intent requirement which *Washington* imposed on claims of racial discrimination also applies to claims of sexual discrimination. I think that our directive guidance should also require the district court to face the question in the light of *General Electric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

27. 385 F.Supp. at 557.

28. 385 F.Supp. at 556.